No. 105,493

SIERRA CLUB, *Appellant*, v. ROBERT MOSER, in his Official Capacity as Acting Secretary of the KANSAS DEPARTMENT OF HEALTH AND ENVIRONMENT, and the KANSAS DEPARTMENT OF HEALTH AND ENVIRONMENT, an Agency of the STATE OF KANSAS, *Appellees*, and TRI-STATE GENERATION AND TRANSMISSION ASSOCIATION, INC., and SUNFLOWER ELECTRIC POWER CORPORATION, *Intervenors*.

(310 P.3d 360)

Opinion filed October 4, 2013.

*Amanda W. Goodin*, of Earthjustice, of Seattle, Washington, argued the cause, and *Todd D. True*, of the same office, and *Robert V. Eye*, of Kauffman & Eye, P.A., of Topeka, were with her on the briefs for appellant.

*Steve R. Fabert*, assistant attorney general, argued the cause, and *Jeffrey A. Chanay*, deputy attorney general, was with him on the brief for appellees.

*James D. Oliver*, of Foulston Siefkin LLP, of Overland Park, argued the cause, and *Jonathan A. Rhodes*, of the same firm, and *Howard Kenison* and *Patrick G. Compton*, of Lindquist & Vennum, of Denver, Colorado, were with him on the briefs for intervenor Tri-State Generation and Transmission Association, Inc.; and *William L. Wehrun*, of Hunton & Williams LLP, of Washington, D.C., argued the cause, and *W.C. Blanton*, of Husch Blackwell LLP, of Kansas City, Missouri, *Henry V. Nickel*, of the same firm, and *Mark D. Calcara* and *Mark A. Rondeau*, of Watkins Calcara, Chtd., of Great Bend, were with him on the briefs for intervenor Sunflower Electric Power Corporation.

*Gerald L. Cross, Jr.*, of Cross Law Firm, LLC, of Blue Springs, Missouri, was on the brief for *amicus curiae* Great Plains Alliance for Clean Energy.

The opinion of the court was delivered by

LUCKERT, J.: In this appeal, environmental organization Sierra Club seeks judicial review of the decision of the Secretary of the Kansas Department of Health and Environment (KDHE) to issue an air emission source construction permit to Sunflower Electric Power Corporation (Sunflower) for the construction of an 895-megawatt coal-fired power plant, referred to as Holcomb 2, at the

site of Sunflower's existing plant in Holcomb, Holcomb 1. Sierra Club raises four issues and contends the permit fails to comply with the requirements of the federal Clean Air Act (CAA), 42 U.S.C. § 7401 *et seq.* (2006); implementing federal regulations; the Kansas Air Quality Act (KAQA), K.S.A. 65-3001 *et seq.*; and applicable Kansas Administrative Regulations, K.A.R. 28-19-1 *et seq.* As a preliminary matter, the KDHE questions whether Sierra Club has standing to challenge the permit.

We hold that Sierra Club has standing to bring this action and has established that the KDHE erroneously interpreted and applied the CAA and the KAQA when it failed to apply the regulations of the federal Environmental Protection Agency (EPA) regarding 1-hour emission limits for nitrogen dioxide and sulfur dioxide during the Holcomb 2 permitting process. These EPA regulations became effective before the Holcomb 2 permit was issued, and we hold that the CAA, KAQA, and implementing regulations required the KDHE to apply the regulations during the permitting process. We therefore reverse the KDHE's action of issuing the permit and remand this matter to the KDHE.

Sierra Club's petition for judicial review presents three other issues. One of those issues—whether the KDHE erred in its application of hazardous air pollution emission requirements—is rendered moot by our decision to remand the Holcomb 2 permit because the EPA has adopted new regulations that must be applied on remand. In another issue, Sierra Club argues the KDHE erred in its analysis of the best available control technology (BACT). We reject this argument and Sierra Club's final argument that the procedure followed by the KDHE violated the CAA.

## I. FACTS AND PROCEDURAL POSTURE

In 2006, Sunflower filed with the KDHE an application for a prevention of significant deterioration (PSD) permit for the construction of three new coal-fired electric generators at the site of its existing facility in Holcomb. Soon after, Tri-State Generation and Transmission Association, Inc., obtained an option from Sunflower for rights to a portion of the new power and facilities. Later that year, public hearings were conducted on the draft permit.

In October 2007, although the KDHE staff recommended the PSD permit be issued, the Secretary of the KDHE denied the permit based on the level of greenhouse gas (carbon dioxide) emissions from the proposed generators. At that time, neither the EPA nor the KDHE had placed specific limitations on carbon dioxide emissions. Nevertheless, the Secretary declared carbon dioxide emissions an imminent and substantial hazard to public health and the environment and invoked the Secretary's then-existing power under K.S.A. 65-3012 to "take such action as may be necessary to protect the health of persons or the environment."

Sunflower challenged the KDHE's decision in state and federal courts. While those cases were pending, then-Governor Mark Parkinson and Sunflower entered into a settlement agreement. The agreement established terms and conditions for resuming the KDHE's consideration of Sunflower's permit application and called for Sunflower to reduce the size of its planned expansion, develop wind resources and energy efficiency programs, dismiss the federal lawsuit, and file a motion to stay any pending state court proceedings until the issuance of a permit, at which time Sunflower would request the dismissal of the state court proceedings.

Subsequent to the settlement agreement, the 2009 Kansas Legislature enacted what is now K.S.A. 2012 Supp. 65-3029 (L. 2009, ch. 141, sec. 42; effective May 28, 2009), which provides:

"(a) The secretary shall timely approve a prevention of significant deterioration permit (PSD) to sunflower electric power corporation to be issued consistent with the settlement agreement executed May 4, 2009, by sunflower electric power corporation and the governor of the state of Kansas to resolve all claims or causes of action, or both, pending before various courts and administrative agencies consistent with article V of the settlement agreement.

"(b) This section shall be part of and supplemental to the Kansas air quality act."

The legislature also amended the powers of the Secretary in several ways, one of which was to limit the emergency power that the Secretary had relied upon in denying Sunflower's 2006 PSD permit application. See K.S.A. 2012 Supp. 65-3012; L. 2009, ch. 141, sec. 25 (adopting H.B. 2369).

Consistent with the settlement agreement and the 2009 legislation, Sunflower submitted supplemental materials to the KDHE in late 2009 and early 2010 to update its PSD permit application for the construction of the Holcomb 2 coal-fired power plant. These updates were necessary, at least partially, because of changes in federal requirements that became effective after the first permit had been denied.

The KDHE issued a draft PSD permit for Holcomb 2 and published a notice of scheduled public hearings and a public comment period. During the comment period, the EPA discovered errors in Sunflower's air quality impact modeling. As a result, Sunflower submitted a new modeling analysis, and, in September 2010, the KDHE issued a new draft PSD permit and another public notice of hearings and a comment period. During the subsequent proceedings, the KDHE received numerous communications from various individuals and organizations, including Sierra Club. Sierra Club officials and experts spoke at public hearings and presented written comments, as did Sierra Club members. After the hearings and the final public comment period, Sunflower provided the KDHE with proposed responses to the comments.

At the conclusion of this process, the KDHE staff recommended the permit be issued, and on December 16, 2010, the Secretary of the KDHE issued the final PSD permit—the air emission source construction permit at issue in this appeal—for construction of Holcomb 2. In an extensive "Responsiveness Summary," the KDHE addressed hundreds of public comments, including those submitted by Sierra Club. In large part, the KDHE's responses were identical to those proposed by Sunflower.

Sierra Club filed a petition for judicial review of the permit in the Kansas Court of Appeals. See K.S.A. 2012 Supp. 65-3008a(b) (under the KAQA, the Court of Appeals has "original jurisdiction to review any such final agency action"). Sunflower and Tri-State (collectively the Intervenors) filed a motion for intervention, which the Court of Appeals granted. Subsequently, Sierra Club's petition was transferred to this court pursuant to K.S.A. 20-3018(c).

The KDHE and Intervenors answered the petition for judicial review, with the KDHE raising the jurisdictional question of

whether Sierra Club has standing to challenge the Holcomb 2 PSD permit.

We first address the standing question because it implicates this court's jurisdiction to consider the issues raised by Sierra Club. Then, because we ultimately determine Sierra Club has standing and there is no other objection to jurisdiction, we will address the issues raised by Sierra Club and expand on the facts relating to each issue.

## II. SIERRA CLUB HAS STANDING

In raising the issue of standing, the KDHE alleges that Sierra Club failed to provide facts sufficient to support the claim of standing. As the KDHE argues, parties in a judicial action must have standing as part of the Kansas case-or-controversy requirement imposed by the judicial power clause of Article 3, § 1 of the Kansas Constitution. See *State ex rel. Morrison v. Sebelius*, 285 Kan. 875, 895-96, 179 P.3d 366 (2008). The effect of this requirement is that standing is a component of subject matter jurisdiction, which any party, or the court on its own motion, may raise at any time. See *Cochran v. Kansas Dept. of Agriculture*, 291 Kan. 898, 903, 249 P.3d 434 (2011); *Shipe v. Public Wholesale Water Supply Dist. No. 25*, 289 Kan. 160, 165-66, 210 P.3d 105 (2009). The issue of whether a party has standing in a judicial action, like other jurisdictional issues, presents a question of law. *Bartlett Grain Co. v. Kansas Corporation Comm'n*, 292 Kan. 723, 726, 256 P.3d 867 (2011); *Cochran*, 291 Kan. at 903; *Shipe*, 289 Kan. at 165.

The parties agree that a multilevel analysis—(1) statutory standing and (2) common-law or traditional standing—applies to the determination of whether Sierra Club has standing to challenge the Holcomb 2 PSD permit. To establish statutory standing under the first prong, Sierra Club must satisfy the standing requirements of both the KAQA and the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 *et seq*. See K.S.A. 2012 Supp. 65-3008a(b) (standing requirements of KAQA); K.S.A. 77-611 (standing requirements of the KJRA); *Board of Sumner County Comm'rs v. Bremby*, 286 Kan. 745, 750-64, 189 P.3d 494 (2008); *Families Against Corporate Takeover v. Mitchell*, 268 Kan. 803, 806-07, 810-11, 1 P.3d 884

(2000) (*FACT*); *NEA-Coffeyville v. U.S.D. No. 445*, 268 Kan. 384, 387, 996 P.2d 821 (2000). If Sierra Club meets the statutory requirements, it must also meet the second prong, satisfying the requirements under the common-law standard that is often referred to in our caselaw as the traditional standing test. See *Cochran*, 291 Kan. at 908-09; *Bremby*, 286 Kan. at 750, 761-64.

A. *Statutory Standing Requirements*

The KAQA addresses standing by stating: "Any person who participated in the public comment process or the public hearing who otherwise would have standing under K.S.A. 77-611 [of the KJRA], and amendments thereto, shall have standing to obtain judicial review of the secretary's final action on the permit pursuant to the [KJRA] in the court of appeals." K.S.A. 2012 Supp. 65-3008a(b). This provision has three components: (1) The action must be brought by a person, (2) the person must have participated in the public comment process or the public hearing, and (3) the person must meet the standing requirements of K.S.A. 77-611.

The first component does not present an obstacle to Sierra Club's action. Even though Sierra Club is an association, it qualifies as a person because the KAQA defines "person" to include "any . . . association, . . . public or private corporation, . . . or any other legal entity." K.S.A. 2012 Supp. 65-3002(j).

Sierra Club also satisfies the second component of the KAQA's standing requirements. The record establishes that Sierra Club submitted written comments and its representatives and environmental experts presented oral comments at public hearings. In addition, several individuals attending the public hearings identified themselves as Sierra Club members and some of them presented either oral or written comments.

Nor is the final requirement—standing under the KJRA—an obstacle to Sierra Club's standing. The KJRA's standing statute, K.S.A. 77-611, recognizes four categories of persons who have standing to seek judicial review of an agency action. See K.S.A. 77-602(h) (defining "person"). Sierra Club relies upon one of those four provisions, contending it has statutory standing under K.S.A.

77-611(b) as a "party to the agency proceedings that led to the agency action."

Sierra Club bases its assertion of party status on its participation in the comment period and the public hearings. K.S.A. 77-602(f)(2) defines " '[p]arty to agency proceedings' " to include a person who is "allowed . . . to participate as a party in the proceeding." Further, the holdings in *FACT*, 268 Kan. 803, and *Bremby*, 286 Kan. 745, support Sierra Club's position that participation in a public hearing or providing public comment is sufficient to accord party status in a PSD permitting process.

In *FACT*, the KDHE issued a permit to Murphy Farms, Inc., for the operation of a large-scale hog farm. The permit was issued under the National Pollution Discharge Elimination System, which was a delegated federal permitting program under the Clean Water Act, 33 U.S.C. § 1251 *et seq.* (1994). FACT, a nonprofit corporation, opposed the KDHE's issuance of the permit. This court determined that FACT met the KJRA's standing requirement under the party status provision in K.S.A. 77-611(b) because applicable regulations mandated public hearings and a comment period as part of the permitting process and members of FACT participated in these procedures. *FACT*, 268 Kan. at 810.

*Bremby* arose from a petition for judicial review filed by Tri-County Concerned Citizens, Inc. (Tri-County), an association formed to oppose the issuance of a landfill permit by the KDHE. Addressing the standing of Tri-County to file the petition, this court cited *FACT* and held the association's "submission of written comments during a public notice and comment period and all persons' comments made during a public hearing held by an agency both qualify as participation within the meaning of the KJRA's standing requirements." *Bremby*, 286 Kan. at 758.

Applying K.S.A. 77-611(b) and the holdings in *FACT* and *Bremby* to the circumstances of this case, we conclude that Sierra Club meets the definition of "party" under the KJRA. As we have noted, Sierra Club actively participated in the public comment and hearing process. And the KAQA and its implementing regulations make both public comments and public hearings required parts of a PSD permitting process. See K.S.A. 2012 Supp. 65-3008a(a)

("No permit shall be issued . . . without first providing the public an opportunity to comment and request a public hearing on the proposed permit action."); K.A.R. 28-19-204(b), (c) (requiring public notice and comment period during the PSD permitting process). In addition, the statutes and regulations broadly allow *any* member of the public, without qualification or limitation, to submit written comments on a draft PSD permit during the public comment period and to request or participate in a public hearing. See K.S.A. 2012 Supp. 65-3008a; K.A.R. 28-19-204(a), (c)(8), and (c)(9).

Other provisions further formalize and incorporate the public hearing and comment process into the KDHE's decision-making function. K.A.R. 28-19-204(f) provides that "[w]ritten comments timely received . . . during the public comment period and written comments and oral testimony received during a public hearing shall become part of the permit record." More significantly, K.A.R. 28-19-204(f) mandates that "[a]ll such written and oral comments which are relevant to the permit decision and which are within the jurisdiction established by the permit action shall be considered in making a final decision on the proposed permit action." Further, the KDHE's response to the comments "shall be issued at the time any final permit decision is issued." K.A.R. 28-19-204(g). In issuing the Holcomb 2 PSD permit, the KDHE responded to comments identified as coming from Sierra Club and its representatives.

These statutory and regulatory provisions allowed Sierra Club and its members to participate in public hearings and submit testimony and, as in *Bremby* and *FACT*, to make public participation a part of the permitting process, thus according Sierra Club the status of a party within the meaning of K.S.A. 77-611(b). Consequently, Sierra Club's participation in the agency proceedings entitled it to assert statutory standing under K.S.A. 77-611(b) of the KJRA and under K.S.A. 2012 Supp. 65-3008a(b) because the other components of the KAQA's standing requirements were also met.

## B. *Common-Law Standing Requirements*

The standing inquiry does not end here, however. In order to have standing to file an action in a Kansas court, Sierra Club must

demonstrate that it also meets common-law or traditional standing requirements for associations. See *Cochran*, 291 Kan. at 908; *Bremby*, 286 Kan. at 761; *FACT*, 268 Kan. at 810-11. We conclude those requirements were also met.

Generally, to demonstrate common-law or traditional standing, a person suing individually must show a cognizable injury and establish a causal connection between the injury and the challenged conduct. *Board of Miami County Comm'rs v. Kanza Rail-Trails Conservancy, Inc.*, 292 Kan. 285, 324, 255 P.3d 1186 (2011); *Bremby*, 286 Kan. at 761. To establish a cognizable injury, a party must establish a personal interest in a court's decision and that he or she personally suffers some actual or threatened injury as a result of the challenged conduct. *Lower v. Board of Dir. of Haskell County Cemetery Dist.*, 274 Kan. 735, 747, 56 P.3d 235 (2002).

For an association to have standing, additional requirements are imposed and a three-prong test must be satisfied: "An association has standing to sue on behalf of its members when (1) the members have standing to sue individually; (2) the interests the association seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires participation of individual members." *NEA-Coffeyville*, 268 Kan. 384, Syl. ¶ 2; see *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S. Ct. 2434, 53 L. Ed. 2d 383 (1977) (recognizing the three-prong associational standing test). To meet the first prong, the association must show that it or one of its members has suffered actual or threatened injury—*i.e.*, the association or one of its members must have suffered cognizable injury or have been threatened with an impending, probable injury and the injury or threatened injury must be caused by the complained-of act or omission. See *312 Education Ass'n v. U.S.D. No. 312*, 273 Kan. 875, 885, 47 P.3d 383 (2002) (citing *Sierra Club v. Morton*, 405 U.S. 727, 92 S. Ct. 1361, 31 L. Ed. 2d 636 [1972]); see also *Whitmore v. Arkansas*, 495 U.S. 149, 158, 110 S. Ct. 1717, 109 L. Ed. 2d 135 (1990) (allegations of possible future injury do not satisfy requirements of standing; a "threatened injury must be ' "certainly impending" ' to constitute injury in fact"); *Chamber of Commerce of United States v. E.P.A.*, 642 F.3d 192, 200 (D.C. Cir. 2011)

(association must demonstrate that at least one identified member suffered an " 'actual' " injury or that an alleged future injury to that member is " 'imminent' "); *Sherley v. Sebelius*, 610 F.3d 69, 74 (D.C. Cir. 2010) (to "shift[] injury from 'conjectural' to 'imminent,' " petitioner must show there is a " 'substantial . . . probability of injury' ").

Applying this test in *Bremby*, this court held that Tri-County met the three-prong test and had standing to challenge the lawfulness of the landfill permit. First, the court noted the petition alleged that Tri-County's members " 'will suffer damage to their real property and water supply if the . . . landfill site is unsuitable under applicable legal requirements and if it leaks, causing contamination to the soil, groundwater and surface water.' " 286 Kan. at 763. Second, Tri-County was " 'organized for the purpose of preserving and enhancing the quality of life in Harper, Kingman and Sumner counties,' " and "ensuring that any landfill that is located in Harper County meet[s] environmental standards to protect the groundwater supply and river water . . . [is] germane to this purpose." 286 Kan. at 763. Finally, since Tri-County challenged the permit as arbitrary and capricious because it was issued on faulty environmental studies, that claim did not require the participation of its individual members. 286 Kan. at 763.

Likewise, in *FACT* we held the three-prong association standing test was met. First, the record contained three affidavits from members of the organization in which members alleged "an imminent decrease in the value of their property, some of which was adjacent to the proposed hog farm." 268 Kan. at 804. The alleged decrease in value would be caused by "odor, flies, vermin, pestilence, and possible contamination of surface and ground water." 268 Kan. at 804. One affiant also claimed harmful health consequences to his asthmatic wife and son because of the KDHE's decision to allow the hog farm. This court found the individual members showed sufficient imminent injury to sue individually. Second, there was no doubt that the interests FACT sought to protect were germane to its purpose. FACT was organized for the express purpose of protecting its members from the adverse effects of a large-scale hog farm. Finally, neither the claim asserted nor

the relief requested required the participation of individual members. FACT sought judicial review of an agency action, and the relief sought was revocation of the hog-farm permit. The analysis of whether the KDHE complied with the various rules and regulations involved in granting the permit did not require the participation of individual FACT members. 268 Kan. at 811.

In this case, the KDHE and the Intervenors recognize the similarities between this case, *Bremby*, and *FACT*. Nevertheless, they contend Sierra Club fails to meet the first prong of the association standing test.

(1) *First Prong: Sierra Club Members Have Alleged Injury in Fact*

More specifically, the KDHE and the Intervenors argue the record before the KDHE did not include either written or oral comments establishing that a Sierra Club member faced an imminent injury in fact and, therefore, we must conclude that Sierra Club lacks standing. Sierra Club counters by arguing that there is evidence in the permit record that establishes its standing and, if not, declarations it filed with this court do.

During the permitting process, Sierra Club presented general concerns for the environment and for the health of especially vulnerable segments of the general public and provided expert support for its assertions. Nevertheless, these general environmental and health concerns are not sufficient to establish Sierra Club's standing. As the United States Supreme Court has recognized: "[A] mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization 'adversely affected' or 'aggrieved' [by an agency action] within the meaning of the APA [see Administrative Procedure Act, 5 U.S.C. § 702 (2006)]." *Sierra Club*, 405 U.S. at 739; see *Summers v. Earth Island Institute*, 555 U.S. 488, 494, 129 S. Ct. 1142, 173 L. Ed. 2d 1 (2009) (generalized harm to environment will not alone support standing). The injury must be particularized, meaning it must affect the plaintiff in a "personal and individual way." *Lujan v. Defenders*

*of Wildlife,* 504 U.S. 555, 560 n.1, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992).

No Sierra Club member provided evidence during the permitting process of an imminent and particularized injury to either the member or Sierra Club. Consequently, if our decision were to be solely based on the record before the KDHE, we would conclude Sierra Club fails to meet the first prong of the associational standing test.

This brings us to Sierra Club's alternative argument that our analysis should include the five declarations filed by Sierra Club members with this court after the KDHE questioned Sierra Club's standing and this court issued an order for Sierra Club to show cause why this court has jurisdiction. The KDHE and the Intervenors make several arguments in response: (a) This court is limited to considering the evidence in the agency record and cannot consider the additional evidence in the declarations; (b) the declarations cannot be considered because these members did not make public comments; and (3) even considering the declarations, Sierra Club has failed to establish imminent harm to individual members. For the reasons we discuss, we reject these arguments.

### (a) *Evidence Outside the Agency Record Can Be Considered*

Regarding the contention that our decision must be based solely on the record before the KDHE, we have found no Kansas cases addressing whether a party seeking review of an agency determination can establish standing by submitting affidavits or declarations in court rather than through evidence submitted to the administrative agency. Other courts have considered the issue, and those courts have routinely accepted affidavits or declarations for the purpose of establishing the traditional requirements of standing. The rationale for doing so is that a petitioner does not have a need to establish an injury in fact to participate in the proceedings before the agency. Rather, the injury-in-fact requirement is imposed as a check on a court's power to review and revise legislative and executive action. *E.g., Sierra Club v. E.P.A.,* 292 F.3d 895, 899 (D.C. Cir. 2002) (" 'An administrative agency . . . is not subject to Article III of the Constitution of the United States' . . . . When the

petitioner later seeks judicial review, the constitutional requirement that it have standing kicks in."); see *Summers*, 555 U.S. at 492-93 (doctrine of standing reflects fundamental restriction on courts, which "have no charter to review and revise legislative and executive action" except when necessary "to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law").

Under the holdings of the federal courts, once the burden is on the petitioner to establish standing in order to invoke the jurisdiction of the court, the petitioner must either identify in the record evidence sufficient to support its standing or, if there is none because standing was not an issue before the agency, submit additional evidence to the court. *Sierra Club*, 292 F.3d at 899; see *Lujan*, 504 U.S. at 560-61 (because the elements of standing—one of which is "injury in fact"—are "not mere pleading requirements but rather an indispensable part of the . . . case, each element must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation").

The KDHE suggests that *Summers*, 555 U.S. 488, undermines these federal cases. But the KDHE's reliance on *Summers* is misplaced because in that case it was the insufficiency of some declarations and the untimeliness of others that prevented the Court's consideration of the declarations, not the fact that the declarations supplemented the agency record.

Highly summarized, in *Summers*, conservation organizations filed suit in federal district court to enjoin the United States Forest Service from applying regulations that eliminated certain notice and appeal rights with respect to projects in national forests nationwide. At that point, the Forest Service argued the plaintiffs lacked standing. The federal district court agreed, holding that organization members' affidavits in support of standing were insufficient, in part, because the members failed to identify any application of the regulations that "threatens imminent and concrete harm." 555 U.S. at 494-95. *After* the federal district court had entered judgment and *after* the Government had filed its notice of appeal, the organizations submitted additional, untimely affidavits to the federal district court in an attempt to prove standing. The

United States Supreme Court granted certiorari and considered the issue of standing, but the Court refused to consider the contents of the affidavits filed after the district court had entered judgment, stating: "If [the organizations] had not met the challenge to their standing at the time of judgment, they could not remedy the defect retroactively." 555 U.S. at 495 n.*.

Hence, in *Summers*, the Supreme Court refused to consider the affidavits because the issue of standing had already been adjudicated in federal district court before the affidavits were filed. The Court did not indicate that affidavits or declarations were an inappropriate mechanism for meeting a party's burden to establish that it has standing. Nor did the Court hold that the federal district court erred in considering the initial, timely declarations. This is significant because, in the present case, this court is making the first determination of standing. Hence, our court essentially takes on the same role as the federal district court in *Summers*, and nothing in *Summers* suggests it was error for the district court to have considered the affidavits before ruling on the issue.

Thus, contrary to the KDHE's argument, *Summers* does not abrogate the view of federal courts that affidavits or declarations can be used to establish standing of a party in cases involving judicial review of an agency action. Nevertheless, the federal decisions do not control our interpretation of the judicial power clause of Article 3, § 1 of the Kansas Constitution. Yet, Kansas courts have looked to federal caselaw as persuasive authority and have generally interpreted our judicial power clause in a manner similar to the federal case-and-controversy requirement. See *State ex rel. Morrison v. Sebelius*, 285 Kan. 875, 896-97, 179 P.3d 366 (2008). We could not do so, however, if the Kansas Constitution or any state law prohibited us from applying the same principles.

The only prohibitions suggested by the KDHE and the Intervenors are the provisions of the KAQA and the KJRA that generally limit judicial review of an agency action to the agency record. K.S.A. 2012 Supp. 65-3008a(b) provides, in part, that "[t]he record before the court of appeals shall be confined to the agency record for judicial review and consist of the documentation submitted to or developed by the secretary in making the final permit decision."

Likewise, K.S.A. 77-618 of the KJRA provides that review is "confined to the agency record for judicial review," although K.S.A. 77-619(a) does permit the supplementation of the record with additional evidence in some limited circumstances. Those circumstances, however, do not include establishing standing.

Despite the limited nature of the exceptions stated in K.S.A. 77-619(a) and the general prohibition against additional evidence found in both the KAQA and the KJRA, we conclude these provisions do not prohibit our consideration of the members' declarations for purposes of determining the existence of Sierra Club's standing to challenge the permit in this court. Neither K.S.A. 2012 Supp. 65-3008a nor K.S.A. 77-618 addresses the judicial power clause of the Kansas Constitution. Rather, both statutory provisions are limited to the scope of a court's review of *an agency's actions*. The KDHE made no findings on the issue of standing, nor was it asked to take such action. Therefore, we are not addressing standing in the context of a review of the agency's determination on the issue. And, although an organization such as Sierra Club *could* establish the prerequisites for associational standing at the administrative level, it is not required to do so. Moreover, K.S.A. 2012 Supp. 65-3008a and K.S.A. 77-618 do not address the mechanism for a court's determination of the limitations on the court's own power and jurisdiction. See *Northwest Environmental Defense Ctr. v. BPA*, 117 F.3d 1520, 1527-28 (9th Cir. 1997) ("BPA cited several cases for the proposition that parties appealing agency decisions cannot supplement the record on appeal. These cases are inapposite because they address the merits of the agency decision rather than standing to challenge that decision in a federal court."); *Dickinson v. United States Dept. of Interior*, 982 F.2d 1332, 1339-40 (9th Cir. 1992) (allowed supplemental declarations; standing challenged on appeal).

We conclude that a petitioner may rely on the administrative record or may file affidavits or declarations with a court to establish standing of a party seeking judicial review of an agency action. A court, when determining if it has jurisdiction to review an agency action, can consider the affidavits and declarations as evidence of a petitioner's standing.

### (b) *A Declarant Did Make Public Comments*

The Intervenors also argue the declarations should not be considered because no declarant participated in the agency proceedings. The Intervenors' assertion is factually incorrect. The agency record includes the written testimony of one of the declarants, Barbara Campbell, who appeared at the public hearing in Garden City on August 5, 2010. Furthermore, we are not aware of any authority for the Intervenors' assertion that the statutory standing requirement of participation in the process carries over into the traditional association standing test.

We need not resolve the issue here, however, because we hold that Campbell's declaration, when considered in light of other evidence in the record, is sufficient to establish standing.

### (c) *Campbell's Imminent and Probable Injury*

In arguing otherwise, the Intervenors, speaking broadly of all the declarations, contend the declarants "fail to identify any present, concrete injury . . . but rather identify only their worries and general concerns about pollution . . . ." The Intervenors further argue that "[w]hat Sierra Club says would pass for standing is no more rigorous than the call-in requirements for radio talk shows."

In many respects, the Intervenors are correct. In large part, like the written testimony Campbell presented at the public hearing, her declaration expresses general concerns shared by many citizens near and far from the Holcomb 2 site regarding the negative effects of pollution on the environment. But Campbell adds some details that relate to the adverse health effects of emissions that one of Sierra Club's experts opined would be caused by emissions from Holcomb 2. Specifically, Campbell states that she lives about 4 miles from the Holcomb 2 site, she describes herself as "elderly," and she provides her age. She then declares: "As an elderly person, I am very worried about breathing the pollutants that will come from the new coal plant, and the negative effects that those pollutants may have on my health."

While the declaration thus provides evidence of Campbell's proximity to the Holcomb 2 site and her age, her expression of "concern" does not establish a causal relationship between these

characteristics and an imminent and probable injury related to adverse effects of anticipated pollutants from Holcomb 2. But we are aware of no authority that requires a declarant to both state a threatened injury and establish a causation theory without the assistance of an expert. In fact, where, as here, causation is based on scientific evidence and is not within common understanding, we generally require the opinion of an expert. See, *e.g.*, *Schlaikjer v. Kaplan*, 296 Kan. 456, 464, 293 P.3d 155 (2013). Given that, it is appropriate to examine whether there is other evidence that establishes the missing causal link.

Two items in the record are particularly significant. First, the KDHE's own air quality impact analysis indicates that proximity to the plant, including the 4-mile distance of Campbell's home, increases the exposure to potentially harmful pollutants. Second, in the permit proceedings, Sierra Club presented a written declaration of Jonathan Levy, Ph.D., Associate Professor of Environmental Health and Risk Assessment at the Harvard School of Public Health. In the declaration, Dr. Levy opined that "construction and operation of the proposed unit at the Holcomb site in Kansas would contribute to particulate matter concentrations in the vicinity of the plant and in downwind areas, increasing the health risks . . . to individuals in those areas." This exposure, he further explained, "is associated with a number of serious health problems, such as premature death, cardiovascular and respiratory hospitalizations, and other forms of respiratory and cardiovascular morbidity. These health problems are particularly likely to occur in sensitive populations, *including the elderly*, children, and individuals with diabetes or cardiopulmonary disease." (Emphasis added.) See *Sierra Club v. United States Dep't of Agriculture*, 841 F. Supp. 2d 349, 358-60 (D.D.C. 2012) (holding Dr. Levy's affidavit sufficient to establish Sierra Club met irreparable injury requirement of test for issuing a temporary injunction preventing the Department of Agriculture's Rural Utilities Service from approving or consenting to agreements or arrangements directly related to the Holcomb 2 project or to taking any other major federal actions in connection with the project until an environmental impact study has been completed).

While we have focused on Campbell's declaration, we note other declarations establish that several Sierra Club members are similarly situated—that is, they live near the Holcomb 2 site and are elderly or otherwise vulnerable to the increased health risks substantiated in the record. The combination of these declarations, including Campbell's, the KDHE's studies, and Dr. Levy's opinions establish that these Sierra Club members fall within a demographically identifiable segment of the general population that will see an increased risk of adverse health effects if the Holcomb 2 PSD permit does not comply with statutory and regulatory requirements. Hence, Sierra Club members are threatened with an imminent injury, and we conclude that Sierra Club meets the first prong of the common-law association standing test.

(2) *Prongs Two and Three of the Common-Law Standing Test Are Met*

Regarding the second prong of the common-law association standing test, Sierra Club has shown that the interests it seeks to protect are germane to its purposes; it alleges in its petition for judicial review that it is an organization whose "members live, work, recreate, farm, and engage in other economic activities that will be adversely impacted by [Holcomb 2]. They include senior citizens, children, people with asthma, and other individuals who are especially vulnerable to harm from exposure to . . . pollutants . . . ." And Sierra Club alleges the "aesthetic, conservation, recreational, economic, informational, and procedural interests" of the organization and its members have been adversely affected.

Further, as for the third prong, none of the parties has contended that the relief sought by Sierra Club requires the participation of its individual members in the lawsuit.

In summary, based on the allegations of the petition in this case and in light of Kansas precedent and persuasive federal caselaw, we conclude that Sierra Club has standing to challenge the KDHE's issuance of the Holcomb 2 PSD permit under the KJRA, the KAQA, and common-law or traditional standing requirements.

III. LEGAL BACKGROUND OF SIERRA CLUB'S ISSUES

Our conclusion that Sierra Club has standing means the four

issues raised by Sierra Club can be considered. Before addressing those issues, it is helpful to discuss the interrelationship of the federal CAA and the KAQA.

The federal CAA governs air quality and emissions standards throughout the United States. It provides for a regulatory scheme to protect and enhance the nation's air quality through joint federal and state participation with some responsibilities falling to the federal EPA and others to state agencies. See *Sierra Club v. Georgia Power Co.*, 443 F.3d 1346, 1348 (11th Cir. 2006) (citing 42 U.S.C. §§ 7401[b][1], 7410); accord *Environmental Defense v. Duke Energy Corp.*, 549 U.S. 561, 566-67, 127 S. Ct. 1423, 167 L. Ed. 2d 295 (2007); *Southern Alliance for Clean Energy v. Duke Energy*, 650 F.3d 401, 403-04 (4th Cir. 2011).

To achieve the CAA's goals, Congress established the maximum allowable increases and concentrations for some pollutants. *E.g.*, 42 U.S.C. § 7473 (2006) (establishing sulfur oxide and particulate matter standards). In addition, Congress directed the EPA to establish primary and secondary national ambient air quality standards (NAAQS) for any pollutant "reasonably . . . anticipated to endanger public health or welfare" and to periodically review and revise those standards. 42 U.S.C. § 7408(a)(1)(A) (2006); see 42 U.S.C. §§ 7409(a)(1), (d) (2006) (directing promulgation and review of primary and secondary NAAQS). The CAA also requires the EPA to divide the country into areas designated as "nonattainment," "attainment," or "unclassified" based on whether these areas meet the NAAQS. 42 U.S.C. § 7407(d) (2006).

The states, on the other hand, have the primary responsibility for assuring that air quality within their borders meets the NAAQS. Each state must create a state implementation plan (SIP), which is then submitted to the EPA for approval. See 42 U.S.C. § 7410 (2006). To be approved by the EPA, each SIP must "include enforceable emission limitations and other control measures, means, or techniques . . . as may be necessary or appropriate to meet the applicable requirements of [the CAA]." 42 U.S.C. § 7410(a)(2)(A); see 40 C.F.R. § 52.02(a) (2012); see also *Alaska Dept. of Environmental Conservation v. EPA*, 540 U.S. 461, 470, 124 S. Ct. 983, 157 L. Ed. 2d 967 (2004). Each state has the right to adopt and

enforce its own standards regarding emissions of air pollutants "provided such state standard is no less stringent than any applicable federally mandated SIP provision." *Natural Resources Defense Council, Inc. v. Thomas*, 845 F.2d 1088, 1090 (D.C. Cir. 1988).

Upon approval by the EPA, a SIP becomes binding and is subject to federal enforcement. See 42 U.S.C. § 7413 (2006); see also *Union Electric Co. v. Environmental Pro. Agcy.*, 515 F.2d 206, 211 (8th Cir. 1975) ("Upon approval or promulgation of a state implementation plan [SIP], the requirements thereof have the force and effect of federal law and may be enforced by the Administrator in federal courts."). A state may not unilaterally modify its SIP once it has been approved by the EPA. 42 U.S.C. §§ 7410(i) (modification prohibited), (l) (revisions to plan submitted by a state shall be adopted by such state after reasonable notice and public hearing and cannot interfere with federal requirements); see *Duquesne Light Co. v. E.P.A.*, 698 F.2d 456, 471 (D.C. Cir. 1983) (current SIPs remain in force until EPA formally approves revision); *Kentucky Resources Council, Inc. v. United States E.P.A.*, 304 F. Supp. 2d 920, 927-28 (W.D. Ky. 2004) (approved SIP remains applicable even after state has submitted a proposed revision to EPA).

In Kansas, the KDHE administers and enforces the SIP. See K.S.A. 2012 Supp. 65-3005(b)(1); K.A.R. 28-19-200(hhh). To carry out the responsibility for air quality and pollution control in Kansas, the Secretary of the KDHE has, *inter alia*, the power to adopt, amend, and repeal rules and regulations implementing and consistent with the KAQA; issue such orders as may be necessary to effectuate the purpose of the KAQA; enforce such orders by appropriate administrative and judicial proceedings; and establish ambient air quality standards. K.S.A. 2012 Supp. 65-3005. As such, Kansas' EPA-approved SIP is administered by the Secretary of the KDHE pursuant to provisions in the KAQA and Kansas Administrative Regulations entitled "Ambient Air Quality Standards and Air Pollution Control," K.A.R. 28-19-1 *et seq.*, adopted under the authority of the KAQA. See 40 C.F.R. §§ 52.870, 52.872 (2012); K.S.A. 2012 Supp. 65-3005; K.S.A. 65-3008; K.A.R. 28-19-800; see

also K.A.R. 28-19-200(hhh) (defining "State implementation plan").

Kansas has adopted the national standards, and Kansas' SIP provides for the implementation, maintenance, and enforcement of NAAQS. See 42 U.S.C. § 7410(a), (b); K.A.R. 28-19-200(nn) ("[n]ational ambient air quality standard[s]" means "those standards promulgated at 40 CFR Part 50, revised as of July 1, 1995, which are adopted by reference"); K.A.R. 28-19-350(f)(1) (2012 Supp.) (listing NAAQS for certain pollutants, including nitrogen dioxide and sulfur dioxide).

In addition, Kansas' SIP follows the CAA by requiring a facility to obtain a permit under the PSD construction permit program, the purpose of which is well-described by its title—the prevention of significant deterioration; it is this type of permit that is at issue in this case. The program applies to the modification or construction of a "major emitting facility" that is or will be located in an attainment or unclassified area. See 42 U.S.C. § 7475(a) (2006); 40 C.F.R. § 52.21 (2012); K.S.A. 2012 Supp. 65-3029; K.A.R. 28-19-300; K.A.R. 28-19-350 (2012 Supp.); see also 42 U.S.C. § 7479(1) (2006) (defining "major emitting facility"); 42 U.S.C. § 7479(2)(C) ("construction" includes "modification"); K.A.R. 28-19-200(p) (defining "construction").

Under the PSD regulations, the owner of a proposed source must prove that the construction will not cause violations of certain air quality standards. In the CAA, Congress charged the EPA with promulgating PSD regulations that would "provide specific numerical measures against which permit applications may be evaluated, a framework for stimulating improved control technology, protection of air quality values, and fulfill the goals and purposes set forth" in the PSD program. 42 U.S.C. § 7476(a), (c) (2006). In PSD regulations promulgated under this authority, the EPA sets maximum allowable increases, or "increments," for some pollutants based on a mathematical relationship to each pollutant's NAAQS. See, e.g., 75 Fed. Reg. 64,864, 64,885 (October 20, 2010). The EPA has also established de minimis thresholds which set specific values, in relation to each pollutant's NAAQS, below which the pollutant is not considered to cause or contribute to a violation of

the NAAQS or to an established increment. These increments and de minimis thresholds are then used by the states to calibrate their SIP requirements. See *Environmental Defense Fund v. Adm'r of United States E.P.A.*, 898 F.2d 183, 185 (D.C. Cir. 1990).

In addition, if the facility is located in an attainment area, the owner must prove the proposed operations are in compliance with the best available control technology (BACT) requirements or, if the facility is located in a nonattainment area, the lowest achievable emissions rate technology (LAER). See 42 U.S.C. §§ 7475(a)(4), 7479(3), 7503 (2006); 40 C.F.R. §§ 52.21(b)(12), (j)(2) (2012); K.A.R. 28-19-350(b) (2012 Supp.) (incorporating by reference 40 C.F.R. § 52.21); *US Magnesium, LLC v. United States E.P.A.*, 690 F.3d 1157 (10th Cir. 2012). The LAER requirement is applied in nonattainment areas because the CAA seeks to offset emissions increases in those areas with emissions reductions from other sources in the area. *New York v. E.P.A.*, 443 F.3d 880, 883 n.1 (D.C. Cir. 2006) (citing 42 U.S.C. § 7503).

If a permitting authority determines an owner has met these burdens and issues a PSD permit, the permitting authority must include limitations or conditions to ensure that emissions from the permitted facility: (1) will not cause or contribute to violations of the NAAQS established by the CAA and (2) will be controlled sufficiently to maintain existing air quality in the surrounding region. See *United States v. Pacific Gas & Elec.*, 776 F. Supp. 2d 1007, 1013 (N.D. Cal. 2011).

It is undisputed that the proposed Holcomb 2 power plant is a facility subject to the PSD program. The proposed capacity makes Holcomb 2 a major emitting facility, and Holcomb is located in Finney County, which has been designated as an attainment area for numerous pollutants. See 40 C.F.R. § 81.317 (2012).

Hence, the KDHE's permitting process included a BACT analysis, and the Holcomb 2 PSD permit established emission limits for Holcomb 2. Sierra Club, in two of its issues, argues certain emission limits in the permit do not comply with the CAA and Kansas' SIP. In a third issue, Sierra Club disputes the adequacy of the KDHE's BACT analysis. The final issue disputes whether Sunflower's settlement agreement with then-Governor Parkinson and

the 2009 legislation unilaterally amended Kansas' SIP and violated the procedural requirements of the CAA and the KAQA.

## IV. Standard of Review for All Issues

In reviewing Sierra Club's arguments, our scope of review is governed by the KJRA, K.S.A. 77-601 *et seq.*, and specifically by K.S.A. 2012 Supp. 77-621(c), which enumerates eight circumstances under which a court may grant relief from an agency action. Of those eight circumstances, Sierra Club relies on those stated in K.S.A. 2012 Supp. 77-621(c)(4) to (c)(8) at certain points in its arguments. Those provisions allow relief from a final agency action if:

"(4) the agency has erroneously interpreted or applied the law;

"(5) the agency has engaged in an unlawful procedure or has failed to follow prescribed procedure;

"(6) the persons taking the agency action were improperly constituted as a decision-making body or subject to disqualification;

"(7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act; or

"(8) the agency action is otherwise unreasonable, arbitrary or capricious." K.S.A. 2012 Supp. 77-621(c).

Sierra Club, as the party asserting that the KDHE erred, has the burden of proving one or more of these circumstances apply. See K.S.A. 2012 Supp. 77-621(a)(1). If Sierra Club establishes that errors occurred, "due account shall be taken by the court of the rule of harmless error" under K.S.A. 2012 Supp. 77-621(e).

## V. Failure to Apply 1-Hour Emission Limits Was Error

We first address Sierra Club's contention that the KDHE erred because it did not apply two EPA-promulgated regulations that became effective several months before the Holcomb 2 PSD permit was issued. These regulations established 1-hour emission limits for nitrogen dioxide ($NO_2$) and sulfur dioxide ($SO_2$). The KDHE determined these rules did not apply to Sunflower's pending PSD

permit application because Kansas had not yet amended its SIP in light of the new regulations.

A. *Standard of Review for This Issue*

Sierra Club argues the KDHE's failure to require 1-hour emission limits in the PSD permit is "contrary to law [and] arbitrary, capricious and otherwise unreasonable." In the context of judicial review of an agency action, this falls under two of the eight circumstances under which a court may grant relief as provided in the KJRA. Specifically, a court may grant relief where "the agency has erroneously interpreted or applied the law" or where "the agency action is otherwise unreasonable, arbitrary or capricious." K.S.A. 2012 Supp. 77-621(c)(4), (c)(8).

This issue turns on whether the new emission limits are applicable as a matter of law. This requires us to consider federal law regarding application of new emission limits issued by the EPA under the CAA. " 'Where possible in construing federal statutes, state courts should seek direction from the decision of federal courts interpreting similar language.' " *Purvis v. Williams*, 276 Kan. 182, 188, 73 P.3d 740 (2003). However, "it is within the power of the court to interpret it, absent any otherwise binding court ruling." 276 Kan. at 187.

B. *NO₂ and SO₂ Emissions and the Parties' Arguments*

The EPA's standards for $NO_2$ and $SO_2$ were originally established in the 1970's and included maximum acceptable average concentrations for 1-year periods for both pollutants, as well as 24-hour and 3-hour periods for $SO_2$. *American Petroleum Institute v. E.P.A.*, 684 F.3d 1342, 1345 (D.C. Cir. 2012), *cert. denied* 133 S. Ct. 1724 (2013); *Natural Resources Defense Council, Inc. v. Thomas*, 845 F.2d 1088, 1090 (D.C. Cir. 1988). Kansas' SIP in effect when the Holcomb 2 permit was issued followed these standards. K.A.R. 28-19-350(f)(1). The last formal revision of Kansas' SIP before the Holcomb 2 PSD permit was issued was in 2008. See 40 C.F.R. § 52.870(a), (b) (2012).

In 2010, the EPA promulgated two new final rules in which it adopted 1-hour primary NAAQS for both $NO_2$ and $SO_2$. See 75 Fed. Reg. 6474 (February 9, 2010) (final rule, effective April 12,

2010, for 1-hour primary $NO_2$ standard); 75 Fed. Reg. 35520 (June 22, 2010) (final rule, effective August 23, 2010, for 1-hour primary $SO_2$ standard). The 1-hour primary $NO_2$ standard, found at 40 C.F.R. § 50.11(f) (2010), was upheld in *American Petroleum Institute*, 684 F.3d 1342, and the 1-hour primary $SO_2$ standard, found at 40 C.F.R. § 50.17(b) (2010), was upheld in *National Environmental Development Ass'n v. E.P.A.*, 686 F.3d 803 (D.C. Cir. 2012), *cert. denied* 133 S. Ct. 983 (2013).

In the present case, the KDHE issued the Holcomb 2 PSD permit on December 16, 2010, several months after the April 2010 and August 2010 effective dates of the new 1-hour $NO_2$ and $SO_2$ emission regulations. Nevertheless, the KDHE did not include the new $NO_2$ and $SO_2$ emission limits in the Holcomb 2 permit. In the formal written responses, the KDHE recognized that the EPA had adopted a number of "new federal regulatory requirements and/or recommendation for a facility seeking a PSD permit," including the 1-hour NAAQS for $SO_2$ and $NO_2$. But it determined that only those NAAQS that had been incorporated into Kansas' 2008 SIP applied to the permitting process because the SIP "define[d] the rules and regulations that apply to the proposed project."

Before us, the KDHE argues that under § 110 of the CAA, Kansas will be required to "adopt and submit to EPA a revised SIP to implement, maintain, and enforce" the 1-hour $NO_2$ and $SO_2$ emission regulations. See 42 U.S.C. § 7410(a) (2006). The KDHE asserts that until it submits and the EPA approves a revised SIP reflecting the new 1-hour primary NAAQS, the "approved Kansas SIP continues to have full force and effect" and the KDHE has no obligation to enforce the 1-hour $NO_2$ and $SO_2$ emission regulations. The KDHE cites three cases to support its contention—*Coalition Against Columbus Center v. New York*, 967 F.2d 764 (2d Cir. 1992); *Citizens for a Better Environment v. Wilson*, 775 F. Supp. 1291 (N.D. Cal. 1991); and *Matter of Crown/Vista Energy Project*, 279 N.J. Super. 74, 652 A.2d 212 (1995).

Each of these cases addresses amendments to the NAAQS made in 1990 and corresponding SIP compliance. And the outcome of each case relies on the "savings clause" in the 1990 amendments, which preserves "[a]ny provision of any applicable implementation

plan . . . in effect before November 15, 1990," until revision of the provision is "approved or promulgated" by the EPA. 42 U.S.C. § 7410(n)(1). None of the parties in the present case point to any similar savings provision that would apply to the 2010 amendments to the NAAQS. Hence, these cases provide little guidance.

As further support for its interpretation of the law, the KDHE notes that § 110 of the CAA generally grants a state "three years from the date of the NAAQS publication in which to complete its SIP submission, unless the EPA Administrator prescribes a shorter period." 42 U.S.C. §7410(a)(1). Yet, § 165(c) of the CAA, 42 U.S.C. § 7475(c) (2006), requires PSD permits to be issued within 1 year of the applicant's filing a completed application. The KDHE suggests the requirement for timely consideration of an application means a state need not apply new NAAQS regulations if the 3-year SIP allowance has not expired.

Sierra Club disagrees, asserting that the KDHE's interpretation is contrary to the unambiguous statutory and regulatory language. It recognizes that Kansas' SIP must be amended to reflect the new 1-hour primary NAAQS, but it contends this does not change the fact that the permit-related provisions of federal and Kansas statutes and regulations require any new source to comply with all NAAQS in effect at the time a permit is issued. In Sierra Club's view, the process of amending the SIP, which could take the full 3 years allowed by the EPA, should not and does not delay the application of any new standards to the PSD permitting process or prevent a new source from incorporating and complying with NAAQS at the time the PSD permit is issued. To allow the construction of a new facility that would not comply with emission limits would be contrary to the CAA's purpose of maintaining air quality, according to Sierra Club.

As we consider these arguments, the KDHE asks us to give deference to its interpretation of the CAA and KAQA. This suggestion is contrary to our caselaw, however. As stated in *Denning v. KPERS*, 285 Kan. 1045, 1048, 180 P.3d 564 (2008): "An agency's interpretation of a statute is not conclusive; final construction of a statute always rests within the courts." And, because we exercise de novo review over the issue of statutory construction, we need

not give deference to an agency's interpretation of a statute. See *Village Villa v. Kansas Health Policy Authority*, 296 Kan. 315, 323, 291 P.3d 1056 (2013); *Saylor v. Westar Energy, Inc.*, 292 Kan. 610, 614, 256 P.3d 828 (2011); *Ft. Hays St. Univ. v. University Ch., Am. Ass'n of Univ. Profs*, 290 Kan. 446, Syl. ¶ 2, 228 P.3d 403 (2010). Consequently, we will examine the parties' arguments regarding how to properly construe the various statutes and regulations.

## C. *The New Regulations Should Have Been Applied*

Several statutory provisions and regulations support Sierra Club's position that a permit must conform to *any* NAAQS. Federal law provides that no major emitting facility may be constructed unless the owner or operator demonstrates that "emissions from construction or operation of such facility will not cause, or contribute to, air pollution in excess of *any* . . . [NAAQS] in any air quality control region." (Emphasis added.) 42 U.S.C. § 7475(a)(3) (2006). Similarly, 40 C.F.R. § 52.21(k) (2012) provides, in part, that a permit applicant "shall demonstrate that allowable emissions increases from the proposed source . . . would not cause or contribute to air pollution in violation of: (i) *Any* [NAAQS] in any air quality control region." (Emphasis added.) This regulation applies only to EPA-issued permits, however.

Nevertheless, 40 C.F.R. § 52.21(k) has become applicable in Kansas by incorporation into our state regulations. K.A.R. 29-19-350 (2012 Supp.) states:

"(a) PSD requirement. The requirements of this regulation shall apply to the construction of major stationary sources and major modifications of stationary sources as defined in 40 C.F.R. 52.21 in areas of the state designated as attainment areas or unclassified areas for any pollutant under the procedures prescribed by section 107(d) of the federal clean air act, 42 U.S.C. 7407(d).

"(b) Adoption by reference; exceptions.

(1) *40 C.F.R. 52.21*, as revised on July 1, 2007 and as amended by 75 Fed. Reg. 31606-31607 (2010), *is adopted by reference*, except as specified in paragraphs (b)(2) and (3)." (Emphasis added.)

Notably, subsection (k) is not one of the subsections excepted from the general incorporation by reference. Thus, by incorporating 40 C.F.R. § 52.21(k), Kansas requires a PSD permit applicant to dem-

onstrate that a new stationary source will not cause or contribute to air pollution in excess of *any* NAAQS.

Sierra Club argues the word "any" should be given its ordinary meaning with the effect being that Sunflower needed to demonstrate to the KDHE that Holcomb 2 will not violate any NAAQS, including the $NO_2$ and $SO_2$ 1-hour standards that have yet to be incorporated into Kansas' SIP. In making this argument, Sierra Club cites several federal cases to support its contention that a federal agency is required to apply the federal law in effect at the time it makes a permit decision. See, *e.g., Ziffrin, Inc. v. United States*, 318 U.S. 73, 78, 63 S. Ct. 465, 98 L. Ed. 621 (1943) ("[A] change of law pending an administrative hearing must be followed in relation to permits for future acts. Otherwise the administrative body would issue orders contrary to the existing legislation."); *State of Ala. ex rel. Baxley v. Environ. Pro. Agcy.*, 557 F.2d 1101, 1110 (5th Cir. 1977) (appropriate best practicable technology limitations to be applied in national pollutant discharge elimination system permit were those in effect at the time of initial permit issuance). This general rule was applied to one of the regulations at issue—the new 1-hour $NO_2$ NAAQS—in *In re Shell Gulf of Mexico, Inc., Shell Offshore, Inc.*, OCS Appeal Nos. 10-01 through 10-04, 15 E.A.D. 103, 2010 WL 5478647 (EAB 2010) (EPA agency order). Addressing two EPA-issued outer continental shelf PSD permits, the Environmental Appeals Board held it was inappropriate to rely solely on compliance with the annual $NO_2$ standard after the new 1-hour $NO_2$ NAAQS had been published in a final rule, even though the new NAAQS was not effective until a few days after the PSD permits were issued.

In addition, one case—*WildEarth Guardians v. Jackson*, 870 F. Supp. 2d 847 (N.D. Cal. 2012)—holds that newly adopted NAAQS are to be applied during the federal permitting process even if the EPA has not incorporated the NAAQS into its PSD regulations. In *WildEarth Guardians*, Sierra Club and others sought an injunction compelling the EPA to update or revise the PSD regulations after it had revised the NAAQS for ozone. The EPA argued it did not have a mandatory duty to revise the PSD regulations. The federal

court agreed, noting the EPA had *discretion* to modify them. The court also noted:

"Moreover, a PSD permit applicant is always required to demonstrate that it will not cause or contribute to a violation of the most current NAAQS, regardless of whether the PSD increments and *de minimis* thresholds have been modified after that NAAQS has been revised. See 42 U.S.C. § 7475(a)(3); 40 C.F.R. § 51.166(k)(1), 40 C.F.R. § 52.21(k)(1)." *WildEarth Guardians,* 870 F. Supp. 2d at 854-55.

From this statement, we can reason that if federal PSD regulations do not have to be amended in order for the new NAAQS to apply to a PSD permitting process, it follows that a state SIP does not have to be amended, at least in those states where 40 C.F.R. § 52.21(k) has been adopted.

Nevertheless, while these cases are instructive, they do not address the precise issue at hand: Whether new NAAQS apply to a permit issued after the effective date of the NAAQS even if the NAAQS have not been incorporated into a state's SIP. In fact, we have found no case directly addressing this issue. Consequently, we must construe the relevant provisions ourselves. See *Purvis,* 276 Kan. at 187-88 (in lieu of binding federal court interpretation of federal law, this court may interpret federal statutes). As we frequently state, when construing a statute, "[w]e first attempt to ascertain legislative intent by reading the plain language of the statutes and giving common words their ordinary meanings." *Northern Natural Gas Co. v. ONEOK Field Services Co.,* 296 Kan. 906, Syl. ¶ 3, 296 P.3d 1106 (2013).

A reading of 42 U.S.C. § 7475(a)(3), 40 C.F.R. § 52.21(k), and K.A.R. 29-19-350 leads to the conclusion that the Holcomb 2 PSD permit must comply with *any* NAAQS, including those not incorporated into Kansas' SIP. Simply put, "any" means "any." And courts construing the CAA have given the word an expansive reading, as explained in *New York,* 443 F.3d at 885-86:

"In a series of cases, the Supreme Court has drawn upon the word 'any' to give the word it modifies an 'expansive meaning' when there is 'no reason to contravene the clause's obvious meaning.' [Citations omitted.] Indeed, the Court has read the word 'any' to signal expansive reach when construing the Clean Air Act. In *Harrison v. PPG Industries, Inc.,* 446 U.S. 578, 100 S. Ct. 1889, 64 L. Ed. 2d 525

(1980), the Court resolved a jurisdictional dispute under section 307(b)(1) by interpreting the phrase 'any other final action,' which the Court 'discern[ed to have] no uncertainty.' [Citation omitted.] . . .

"Although EPA is correct that the meaning of 'any' can differ depending upon the statutory setting, see *Nixon v. Missouri Mun. League*, 541 U.S. 125, 132, 124 S. Ct. 1555, 158 L. Ed. 2d 291 (2004), the context of the Clean Air Act warrants no departure from the word's customary effect."

The court also reasoned that the word should not be applied in a way that "would allow sources operating below applicable emission limits to increase significantly the pollution they emit" because this would be contrary to the CAA, "a law intended to limit increases in air pollution." *New York*, 443 F.3d at 886. Likewise, in this case, it would be counter to the purpose of the CAA and the new federal regulations to allow Holcomb 2 to violate the new 1-hour $NO_2$ and $SO_2$ standards. Consequently, there is no basis to depart from the ordinary meaning of the word "any" in this context. Further, requiring Kansas to apply the new standards is consistent with the provisions of the CAA that prohibit a state from having less stringent emission standards than those adopted by the EPA. See *Natural Resources Defense Council, Inc.*, 845 F.2d at 1090.

Nevertheless, as the KDHE suggests, there is an ambiguity that arises from the interplay and seeming conflict between the PSD requirements and the SIP provisions. In this regard we agree with Sierra Club that the PSD requirements—including the mandate that a PSD applicant must meet any NAAQS—is more specific to the question before us and controls. See *Ft. Hays St. Univ.*, 290 Kan. at 463 (specific statutes control over general statutes). While we reach this conclusion based on our de novo review of the statutory and regulatory language, our conclusion that this is the correct way to resolve the ambiguity is strengthened by the EPA's position that the 1-hour standards apply.

The EPA has frequently asserted this position. For example, in denying requests to reconsider the final regulations regarding the $SO_2$ emission standards, the EPA indicated the new 1-hour $SO_2$ NAAQS applied even if a SIP had not yet been amended, stating:

"To the extent necessary to address these PSD requirements for the new 1-hour $SO_2$ NAAQS, SIPs are due no later than 3 years after the promulgation date.

Generally, however, the owner or operator of any major stationary source or major modification obtaining a final PSD permit on or after the effective date of the new 1-hour $SO_2$ NAAQS will be required, as a prerequisite for the PSD permit, to demonstrate that the emissions increases from the new or modified source will not cause or contribute to a violation of that new NAAQS." 75 Fed. Reg. 35520, p. 35578 (June 22, 2010).

The EPA had made similar statements when issuing notices as part of its rulemaking procedure regarding both the $NO_2$ and $SO_2$ 1-hour standards. *E.g.*, 74 Fed. Reg. 64810, p. 64862 (December 8, 2009) ("If EPA establishes a 1-hour NAAQS for $SO_2$, the owner or operator of any major stationary source or major modification locating in an attainment or unclassifiable area for $SO_2$ will be required, as a prerequisite for a PSD permit, to demonstrate that the emissions increases from the new or modified source will not cause or contribute to a violation of the new NAAQS."); 75 Fed. Reg. 6474, p. 6525 (February 9, 2009) ("[M]ajor new and modified sources applying for NSR/PSD permits will initially be required to demonstrate that their proposed emissions increases of NOX will not cause or contribute to a violation of either the annual or 1-hour $NO_2$ NAAQS and the annual PSD increment.").

These $NO_2$- and $SO_2$-specific statements are consistent with the position the EPA has generally taken when distinguishing between the SIP amendment process and the permitting process. In an Internal Guidance Memorandum addressing state permitting processes, the EPA indicated it "does not agree with one commenter's suggestion that [an amendment to existing] NAAQS would not take effect until the time a State first promulgates limitations for the pollutant in a SIP." 75 Fed. Reg. 17004, p. 17018 (April 2, 2010). The EPA has also explained that, in absence of a "grandfathering provision that allows pending applications to apply standards in effect when the application is complete, a final permit decision issued after the effective date of a NAAQS must consider such a NAAQS." 75 Fed. Reg. 17004, p. 17018.

But the EPA has also recognized that application of this policy to a state permitting program is not absolute, stating:

"The timing when the NAAQS operates in this manner under SIP-approved programs is potentially more nuanced and depends on whether State laws are suffi-

ciently open-ended to call for application of a new NAAQS as a governing standard for PSD permits upon the effective date. EPA believes that State laws that use the same language as in EPA's PSD program regulations at 52.21(k) and 51.166(k) are sufficiently open-ended and allow such a NAAQS to 'take effect' through the PSD program upon the effective date of the NAAQS." 75 Fed. Reg. 17004, p. 17018.

See also 75 Fed. Reg. 35520, p. 35580 (June 22, 2010) (addressing federal permitting process and requiring application of any new or revised standard).

The KDHE and Intervenors acknowledge the EPA's position but argue the KDHE has properly construed the PSD requirements of Kansas law as not being "sufficiently open-ended" as to allow the new 1-hour NAAQS to apply before redesignation and SIP revision. This conclusion is contrary to the EPA's explanation of what it means by "sufficiently open-ended."

The EPA has generally determined that a SIP is "sufficiently open-ended" if the SIP uses the language found in the EPA's PSD program regulations at 40 C.F.R. § 52.21 and 40 C.F.R. § 51.166(k) (2012). As we have discussed, Kansas has adopted the same language as 40 C.F.R. § 52.21 by incorporating it into K.A.R. 29-19-350. Similarly, K.A.R. 28-19-350(d) (2012 Supp.) adopts by reference 40 C.F.R. part 51, "Subpart I, as revised on July 1, 2007 and as amended by 75 Fed. Reg. 31606 (2010)." 40 C.F.R. § 51.166 is included in part 51, subpart I. Hence, the Kansas regulations, by incorporation of the two federal regulations, render Kansas' SIP sufficiently open-ended so as to require application of NAAQS upon the NAAQS' effective date.

Consistent with our conclusion, the EPA has also taken the position that Kansas' laws are sufficiently open-ended as to require application of the new federal regulations during the permitting process in this case. In a letter regarding Sunflower's PSD permit application dated April 2, 2010, the EPA expressed to the KDHE that the

"KDHE has adopted the federal PSD rule by reference. Accordingly, we believe that the KDHE's permit rules are sufficiently open-ended so as to require Sunflower to demonstrate compliance with new or revised NAAQS as part of any PSD permit that is issued to the source on or after the effective date of the applicable NAAQS."

Then, in an August 2010 comment to the KDHE, the EPA indicated that "to assure compliance with the 1-hour $NO_x$ and $SO_2$ NAAQS, the permit needs to contain . . . 1-hour average emission rates for both the new and existing steam generating units."

The KDHE rejected this viewpoint and, before us, argues we should not follow the EPA's guidance because the immediate application of the new 1-hour standards is "nonsensical" when the KDHE has not had an opportunity to incorporate them into Kansas' SIP, determine the level of analysis an applicant must undergo, or determine enforcement mechanisms. The KDHE is not the first state agency or industry source to raise this argument. In fact, in issuing the final 1-hour NAAQS for $SO_2$, the EPA noted similar criticisms about applying the new regulation during the permitting process "without an EPA-approved de minimis value that could be used in determining the level of analysis that individual PSD sources must undergo." 75 Reg. Reg. 35520, p. 35580. Despite this criticism, the EPA left in place its prior conclusion that new regulations apply to federal and state permitting processes where the state has sufficiently open-ended laws. 75 Fed. Reg. 35520, p. 35580.

Nevertheless, as the KDHE points out, the EPA's guidance on this topic is not controlling. See *American Petroleum Institute v. E.P.A.*, 684 F.3d 1342, 1354 (D.C. Cir. 2012), *cert. denied* 133 S. Ct. 1724 (2013) (statement in preamble to 1-hour $SO_2$ rule that "applicants 'will initially be required' is predictive of the agency's future actions, not one from which 'legal consequences w[ould] flow' "); *Alaska Dept. of Environmental Conservation v. EPA*, 540 U.S. 461, 487-88, 124 S. Ct. 983, 157 L. Ed. 2d 967 (2004) (EPA's guidance memorandums are not binding on a court and are not entitled to deference); but see *City of Las Vegas v. F.A.A.*, 570 F.3d 1109, 1117 (9th Cir. 2009) (If a regulation is ambiguous, courts "consult the preamble of the final rule as evidence of context or intent of the agency promulgating the regulations.").

Although not controlling and not subject to our deference, we find the EPA's position persuasive because it is consistent with the CAA's goal of preventing air quality deterioration and with our own reading of the plain language of 42 U.S.C. § 7475(a)(3), 40 C.F.R.

§ 52.21(k), and K.A.R. 29-19-350(a), (b) (2012 Supp.). See *Alaska Dept. of Environmental Conservation*, 540 U.S. at 486 (citing 42 U.S.C. §§ 7470[3], [4] and noting that "Congress' reason for enacting the PSD program—[is] to prevent significant deterioration of air quality in clean-air areas within a State and in neighboring States"). Consequently, applying the plain meaning of the words in 42 U.S.C. § 7475(a)(3), 40 C.F.R. § 52.21(k), and K.A.R. 29-19-350(a), (b) (2012 Supp.), we hold that a PSD permit applicant must demonstrate that the project will not cause air pollution in excess of *any* NAAQS even if those standards have not been incorporated into Kansas' SIP, unless the federal regulatory requirements indicate otherwise. This would include the new 1-hour $NO_2$ and $SO_2$ NAAQS, and we hold the KDHE erred in failing to apply those NAAQS during the permitting process. Because of this holding, we need not address Sierra Club's alternative argument that the KDHE erred in conducting the modeling that served as the basis for the $NO_2$ and $SO_2$ emission limits that were included in the Holcomb 2 PSD permit.

We must, however, consider the Intervenors' argument that any error would be harmless because "any issues related to emission limitations addressing the new NAAQS could be resolved during the period that Holcomb 2 is under construction and prior to operation of the new unit." In support of this argument, the Intervenors ask us to consider a February 3, 2011, EPA letter to the KDHE, which states, in part: "KDHE should consider a permit amendment to include enforceable 1-hour emission limits prior to the construction and/or operation of the new [Holcomb 2] unit. KDHE may also want to consider the latest EPA guidance on $NO_2$ modeling as part of any permit amendments."

This letter, which was sent after the Holcomb 2 PSD permit had been issued, is not in the record of proceedings before the KDHE. The Intervenors request us to take "judicial notice pursuant to K.S.A. 60-412 . . . . The authenticity and content of the addenda are specific facts immediately verifiable through EPA as provided in K.S.A. 60-409(b)(4)." The Intervenors do not attempt to reconcile the judicial notice provision with the KAQA and KJRA provisions that limit our consideration to matters in the agency record.

See K.S.A. 2012 Supp. 65-3008a(b); K.S.A. 77-618. But we need not resolve that question because we reject the Intervenors' argument that an agency's error is harmless simply because the agency might cure the error through future action. Our jurisdiction is limited to the action taken by the KDHE.

Because the issuance of the Holcomb 2 PSD permit to Sunflower was based on errors of law under the CAA, we remand the permit to the KDHE for application of the new federal regulations setting out 1-hour $NO_2$ and $SO_2$ standards. See K.S.A. 2012 Supp. 77-621(c)(4) (relief from agency action granted if agency erroneously interprets or applies the law).

## VI. OTHER NEW STANDARDS MUST ALSO BE APPLIED

In another issue, Sierra Club argues the KDHE erred in issuing the Holcomb 2 PSD permit without adequate emission limits for a group of more than 150 pollutants listed in 42 U.S.C. § 7412(b)(1) (2006), which are collectively termed "hazardous air pollutants" (HAPs). At the time Sunflower was going through the permitting process in this case, the EPA had not issued HAPs emission limits for coal-fired plants. Under the CAA, if a category-wide emission limit has not been published, the KDHE, as the permitting authority, is required to calculate case-by-case emission limits for HAPs under the maximum achievable control technology (MACT) standard and include that emission limit in a permit for a new "major source" of HAPs. 42 U.S.C. § 7412(g)(2)(B); 40 C.F.R. §§ 63.42, 63.43 (2012); K.A.R. 28-19-752a(b), (d). Consequently, the KDHE had to determine whether Holcomb 2 would be a major source of HAPs emissions and, therefore, subject to the MACT requirement. See *Southern Alliance For Clean Energy v. Duke Energy*, 650 F.3d 401, 404 n.1 (4th Cir. 2011). In issuing the PSD permit, the KDHE determined that Holcomb 2 would *not* be a major source. Sierra Club challenged that determination in its petition for judicial review.

But now, as undisputed by the parties, it is irrelevant whether Holcomb 2 will be a major source of HAPs because on February 16, 2012, after the PSD permit was issued, the EPA established national limits for mercury, acid gases, and other toxic emissions

from all coal- and oil-fired electric utility steam generating units of more than 25 megawatts. See 40 C.F.R. § 63.10042 (2012); 77 Fed. Reg. 9304 (February 16, 2012) (EPA's rule known as the "Mercury and Air Toxics Standards"). All parties agree that Holcomb 2 is designed to exceed this threshold. Further, the parties agree the new HAPs emission limits apply to Holcomb 2 even though the EPA's final rule on the matter was not effective until after the PSD permit was issued because the rule clearly states that "any source that 'commenced' construction after the May 3, 2011, proposal date is considered a new source under the statute and the source must comply with the new source standards even if the source received a final and legally effective CAA section 112[g] permit before proposal." 77 Fed. Reg. 9304, pp. 9399, 9366; 40 C.F.R. §§ 63.9982(b) (2013), 63.9985 (2012). The EPA subsequently stayed the rule (for new sources only) but has now announced that the rule "is and remains in effect for all sources." 78 Fed. Reg. 24073, p. 24075 (April 24, 2013); see 40 C.F.R. § 63.9982 (2013).

What the parties disagree on is how this court should deal with the change in the law. The Intervenors filed a motion seeking the dismissal of that portion of Sierra Club's petition in which Sierra Club sought review of the KDHE's major-source ruling; the Intervenors argued this request for relief was moot. Sierra Club responded and filed a motion for summary judgment, arguing the PSD permit did not comply with federal law.

We need not delve into which type of procedural relief is more appropriate.

"When it clearly appears by reason of changed circumstances between the trial of an action and its review in this court that any judgment this court [might] render would be unavailing as to the particular issue litigated, this court ordinarily will not consider and decide the mooted issue whether one of law or fact." *Dickey Oil Co. v. Wakefield,* 153 Kan. 489, Syl. ¶ 1, 111 P.2d 1113 (1941).

Here, the EPA's retroactive regulation and our decision to remand renders both the original issue regarding whether Holcomb 2 would be a major source of HAPs and the parties' disagreement about the procedural effect of the new HAPs rule moot. Therefore, this issue will not be analyzed.

On remand, the KDHE must apply the new HAPs emission limits that are explicitly retroactive to this permit.

## VII. KDHE's BACT DETERMINATIONS ARE NOT REVERSIBLE

In another issue, Sierra Club argues the KDHE's determinations of emission limits in the Holcomb 2 PSD permit fail to adequately reflect the best available control technology (BACT) for each regulated pollutant which the facility has the potential to emit in significant amounts. 42 U.S.C. §§ 7475(a)(4), 7479(3) (2006); 40 C.F.R. §§ 52.21(b)(12), (j)(2) (2012); K.A.R. 28-19-350(b) (2012 Supp.) (incorporating by reference 40 C.F.R. § 52.21).

### A. *This Issue May Be Moot*

Before discussing the merits of this issue, we must first consider whether this issue is rendered moot by our decision to remand the Holcomb 2 PSD permit. In their briefs, the parties do not discuss the potential for some arguments becoming moot if we find error on another issue. Nor do the parties suggest the scope of proceedings if the permit is remanded. Instead, we raise these questions *sua sponte*. In doing so, we recognize that the parties should be given an opportunity to present their positions regarding the scope of proceedings on remand and whether there must be a new BACT determination. See *State v. Puckett*, 230 Kan. 596, 601, 640 P.2d 1198 (1982).

We also recognize there may be factual components to these arguments. For example, we are unable to determine whether additional modeling is necessary under the new 1-hour $NO_2$ and $SO_2$ NAAQS. In addition, we are unable to determine the potential effect of an order to stay that is referred to in the parties' arguments but is not in the record before us. Based on the arguments, it appears that the KDHE stayed the effect of K.A.R. 28-19-301(c), which provides that a PSD permit will expire if construction has not begun within 18 months of its issuance. See 40 C.F.R. § 52.21(r)(2); *Sierra Club v. Franklin County Power of Illinois*, 546 F.3d 918, 934 (7th Cir. 2008) (18-month limitation "ensures that major emitting facilities comply with up-to-date [pollution control] . . . technology"). We can only speculate as to the specifics of that

order or its impact on remand proceedings, and the order is not before us for review.

We, therefore, determine that the scope of the proceedings on remand must be determined by the KDHE. Because we express no opinion on the appropriate scope, we cannot rule that Sierra Club's BACT issue is moot. It is conceivable the KDHE will rely on some or all of its prior determinations. We also note that the application of BACT regulations is an issue of first impression in Kansas. See *State v. Scott*, 286 Kan. 54, 107, 183 P.3d 801 (2008) (recognizing court may discuss issues to provide guidance on remand). Consequently, we will discuss the parties' arguments regarding the BACT analysis.

B. *Standard of Review for This Issue*

In presenting this issue, Sierra Club relies on K.S.A. 77-621(c)(4) and (c)(8) of the KJRA in citing the standard of review. Under these provisions, a court may grant relief where "the agency has erroneously interpreted or applied the law" or where "the agency action is otherwise unreasonable, arbitrary or capricious." K.S.A. 2012 Supp. 77-621(c)(4), (c)(8).

Sierra Club also suggests we find that the KDHE's failure to adequately include some technologies in the BACT analysis was "clear error." The "clear error" standard is a federal standard applied in proceedings before the Environmental Appeals Board, pursuant to 40 C.F.R. § 124.19(a)(1) (2012) (petition for review must show that a "finding of fact or conclusion of law . . . is clearly erroneous"). This standard does not apply under the KJRA.

Instead, where a court reviews an agency's factual findings under the KJRA, the court reviews the record as a whole to determine whether those findings are supported by substantial evidence. Relief is granted if the court determines that "the agency action is based on a determination of fact, made or implied by the agency, that is not supported by evidence that is substantial when viewed in light of the record as a whole." K.S.A. 2012 Supp. 77-621(c)(7). The KJRA defines "in light of the record as a whole" to include the evidence both supporting and detracting from an agency's find-

ing. K.S.A. 2012 Supp. 77-621(d); *Redd v. Kansas Truck Center*, 291 Kan. 176, 182-83, 239 P.3d 66 (2010).

The two provisions cited by Sierra Club as a basis for relief with regard to an agency's factual findings—K.S.A. 2012 Supp. 77-621(c)(7) and (c)(8)—also provide a mechanism for review of issues of law. Under subsection (c)(8), an agency action is reviewed to determine if it is "unreasonable, arbitrary or capricious." An action that is not based on determined principles, which would include applicable law, is unreasonable, arbitrary, and capricious. See *Dillon Stores v. Board of Sedgwick County Comm'rs*, 259 Kan. 295, 299, 912 P.2d 170 (1996).

## C. *BACT Requirements*

BACT is not a particular type of technology. It is an " 'emission limitation based on the maximum degree of reduction of each pollutant subject to regulation . . . which the [state] permitting authority [here, the KDHE], on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable' for the facility in question." *Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008, 1011 (8th Cir. 2010) (quoting 42 U.S.C. § 7479[3]); see *National Parks & Conservation v. Tennessee Valley*, 502 F.3d 1316, 1325 (11th Cir. 2007) (BACT is to be determined through the preconstruction permitting process); 2 Pub. Nat. Resources L. § 18:23 (2d ed. 2013) (explaining BACT).

During the permitting process, the KDHE and Sunflower indicated they were following the top-down method in conducting their BACT determinations. The Ninth Circuit Court of Appeals has described the top-down method as follows:

"Under this method, as detailed in the EPA's *New Source Review Workshop Manual* (1990), the applicant ranks all available control technologies in descending order of control effectiveness. The most stringent technology is BACT unless the applicant can show that it is not technically feasible, or if energy, environmental, or economic impacts justify a conclusion that it is not achievable. *Citizens for Clean Air v. United States EPA*, 959 F.2d 839, 845-46 (9th Cir. 1992). If the top choice is eliminated, then the next most stringent alternative is considered, and so on. The most effective control option not eliminated is BACT. [Citation omit-

ted.]" *Alaska, Dept. Environ. Conserv. v. United States E.P.A.*, 298 F.3d 814, 822 (9th Cir. 2002), *aff'd* 540 U.S. 461, 124 S. Ct. 983 157, L. Ed. 2d 967 (2004).

Basically, there are five steps in a top-down BACT analysis:

"(1) identifying all available control technologies for the proposed process or source;
"(2) evaluating the technical options for the proposed process or source;
"(3) comparing the remaining control technologies based on effectiveness;
"(4) evaluating the remaining options taking into consideration energy, environmental and economic impacts; and [5] selecting BACT." *Sierra Club v. Wisconsin Dep't of Natural Res.*, 327 Wis. 2d 706, 718-19, 787 N.W.2d 855 (Wis. App. 2010), *rev. denied* 332 Wis. 2d 278 (2011).

Although the top-down analysis is a common approach to the BACT determination, it is not mandated by the CAA. *Alaska, Dept. Environ. Conserv.*, 298 F.3d at 822; *Citizens for Clean Air v. United States E.P.A.*, 959 F.2d 839, 845 (9th Cir. 1992) (top-down approach places the burden of proof on " ' "the applicant to justify why the proposed source is unable to apply the best technology available" ' ").

In presenting its BACT issue, Sierra Club does not take issue with the KDHE's use of the top-down analysis. Instead, it disagrees with the way in which the KDHE applied the top-down approach. While this court has never reviewed an agency's application of the top-down approach, other courts have. Those decisions, especially the federal decisions, provide persuasive authority because Kansas regulations adopt the federal statutory definition of BACT found at 40 C.F.R. § 52.21(b)(12). See K.A.R. 28-19-350(b) (2012 Supp.).

## D. *Sierra Club's Contentions*

Sierra Club specifically contends the KDHE erroneously failed to adequately consider (1) innovative fuel combustion techniques such as integrated gasification combined cycle (IGCC) technology; (2) "clean fuels" such as natural gas; and (3) ultra-supercritical pulverized coal technology. According to Sierra Club, the KDHE's failure to adequately consider these types of production techniques in its BACT analysis renders the permit unlawful. In addition, Sierra Club makes a fourth argument that the KDHE erred in failing to include emission limits that are based on an adequate BACT

analysis for many individual pollutants, including nitrogen oxides and particulate matter.

(1) *IGCC Technology*

Sierra Club argues the KDHE erred by not including IGCC technology in the first step of its BACT analysis. The KDHE and Intervenors argue IGCC technology was properly omitted from step one because its use would require a redesign of the facility. Indeed, " '[h]istorically, EPA has not considered the BACT requirement as a means to redefine the design of the source when considering available control alternatives.' " *Longleaf Energy v. Friends of the Chattahoochee*, 298 Ga. App. 753, 760-61, 681 S.E.2d 203 (2009) (quoting EPA, New Source Review Workshop Manual: Prevention of Significant Deterioration and Nonattainment Area Permitting, p. B.13 [1990]). The EPA's interpretation has been repeatedly upheld in litigation. *E.g.*, *Sierra Club v. United States E.P.A.*, 499 F.3d 653, 654 (7th Cir. 2007) (accepting EPA's interpretation that BACT "does not include redesigning the plant proposed by the permit applicant"); *Blue Skies Alliance v. Com'n*, 283 S.W.3d 525, 535 (Tex. App. 2009) ("BACT analysis must consider any control technology that may be applied to the proposed facility, but does not need to consider any control technology that would require such a redesign of the facility that it would constitute an alternative proposal.").

Sierra Club does not disagree that a permitting authority need not consider a technology that would be a redesign of a proposal. It disputes the conclusion that the use of IGCC technology at Holcomb 2 would demand a redesign. Sierra Club cites *In re Desert Rock Energy Company, LLC*, PSD Appeal Nos. 08-03 through 08-06, 14 E.A.D. 484, 2009 WL 3126170 (EAB 2009) (EPA agency order), for support of its argument. See *Utah Chapter of Sierra Club v. Air Quality*, 226 P.3d 719, 733 (Utah 2009) (adoption of IGCC technology would not require power company to redefine the design of its proposed facility, an electric power generating plant fueled by coal; while IGCC technology need not necessarily be adopted, it should have been considered in top-down BACT analysis); see also *Powder Riv. Bas. Res. v. Dep. of Env. Qual.*, 226

P.3d 809, 823 n.6 (Wyo. 2010) (coal is utilized in both pulverized coal-fired power plants and power plants employing IGCC technology; but IGCC power plants are fueled by synthetic gas converted from coal).

While these cases support Sierra Club's position, in several other cases courts have concluded that IGCC technology need not be included in the first step because its use would require redesigning the pulverized coal-fired facility. See *Blue Skies Alliance*, 283 S.W.3d at 537 ("It is clear that an IGCC process . . . is significantly different from the pulverized coal power plant"; appellants failed to offer any evidence that IGCC technology is a process that could be applied to the proposed power plant.); *Longleaf Energy*, 298 Ga. App. at 761-62 (rejecting lower court ruling that imposition of IGCC technology on a proposed pulverized coal facility would not redefine the source); *Sierra Club v. Environmental & Public Protection Cabinet*, No. DAQ-27602-042, 2007 WL 3025076 (Ky. Envir. Pub. Prot. Cab. 2007) (agency order) (state agency decision not to require consideration of IGCC technology was not clearly erroneous or contrary to law or fact).

This split in authority is reflected in the EPA's own fluid policy. In 2005, the EPA "declared that the requirement of IGCC technology at a proposed pulverized coal facility 'would fundamentally change the scope of the project and redefine the basic design of the proposed source.'" Stensvaag, *Preventing Significant Deterioration Under the Clean Air Act: The BACT Determination—Part I*, 41 Envtl. L. Rep. News & Analysis 11101, 11116 (December 2011) (quoting Memorandum from Stephen D. Page, Director of EPA's Office of Air Quality Planning and Standards, Best Available Control Technology Requirements for Proposed Coal-Fired Power Plants [December 13, 2005], at 2). Accordingly, the EPA announced it " 'would not require an applicant to consider IGCC in a BACT analysis for a [pulverized coal] unit' " and " 'would not include IGCC in the list of potentially applicable control options that is compiled in the first step of a top-down BACT analysis.' " 41 Envtl. L. Rep. News & Analysis, at 11116 (quoting Page, Memoranda, at 3). The EPA changed this position in 2011, announcing it " 'no longer subscribes' " to its prior position and IGCC " 'tech-

nology should not be excluded on redefining the source grounds at Step 1 of a BACT analysis in any particular case unless the record clearly demonstrates why the permit applicant's basic or fundamental business purpose would be frustrated by application of this process.' " 41 Envtl. L. Rep. News & Analysis, at 11116 (quoting EPA Office of Air and Radiation, PSD and Title V Permitting Guidance for Greenhouse Gases [March 2011], at 30 n.83).

The EPA's focus on whether the use of a control technology would redesign or frustrate an applicant's basic or fundamental business purpose was discussed in *Desert Rock Energy*, the case relied on by Sierra Club. There, a permit authorized Desert Rock Energy to construct a new 1,500-megawatt coal-fired electric generating facility. The Environmental Appeals Board remanded in part because the agency failed to adequately consider IGCC technology in the BACT analysis. The Board first explained the differences in IGCC and pulverized-coal burning technology, stating:

"In a typical pulverized coal combustion-based electric generating facility . . . coal is burned to create heat, which is used to boil water, creating steam that drives a steam turbine power generator. [Citations omitted.] IGCC, on the other hand . . . uses coal, but in an initial 'gasification' part of the process, the coal is chemically converted into a synthetic gas ('syngas'). [Citations omitted.] The syngas is cleaned to remove various pollutants, such as particulate matter, mercury, sulfur compounds, ammonia, and other acid gases, and is then burned in a gas turbine to generate electric power. [Citations omitted.] Heat is recovered from the gas turbine and the gasification process and is then used to produce additional power using a steam turbine. [Citations omitted.] Thus . . . 'IGCC is not simply an add-on emissions control technology,' but instead requires a differently designed power block. [Citation omitted.]" *Desert Rock Energy*, 2009 WL 3126170, at °32.

Although a differently designed power block would be required, the Board did not automatically conclude IGCC technology required a different design than the applicant had proposed. Instead, the Board noted an ambiguity existed between the redesign policy and three CAA provisions that require a permitting authority to consider BACT, clean fuels, and alternatives suggested by interested persons. To reconcile the inherent conflict in these policies, the Board concluded that " 'the crucial question [is] where control technology ends and a redesign of the "proposed facility" begins.' " *Des-*

ert *Rock Energy*, 2009 WL 3126170, at *35 (quoting *Sierra Club*, 499 F.3d at 655. The Board noted that the following test had been previously applied:

"[T]he permit applicant initially 'defines the proposed facility's end, object, aim, or purpose—that is the facility's basic design,' although the applicant's definition must be 'for reasons independent of air permitting.' [Citations omitted.] The inquiry, however, does not end there. The permit issuer . . . should take a 'hard look' at the applicant's determination in order to discern which design elements are inherent for the applicant's purpose and which design elements 'may be changed to achieve pollutant emissions reductions without disrupting the applicant's basic business purpose for the proposed facility,' while keeping in mind that BACT, in most cases, should not be applied to regulate the applicant's purpose or objective for the proposed facility. [Citations omitted.]" *Desert Rock Energy*, 2009 WL 3126170, at *36.

Applying this test, the Board found that the permitting agency had not provided a rational explanation for why IGCC technology would redefine the source and failed to adequately explain its conclusion in light of the agency having previously issued permits at similar facilities in which IGCC technology had been considered in the first step of the BACT analysis. The agency's explanation was particularly weak because the applicant had initially indicated that IGCC was a technology that could be considered for its proposed facility. *Desert Rock Energy*, 2009 WL 3126170, at *41.

The analysis of another court also helps explain the dividing line between design elements that are inherent in the business purpose and those that may be changed without disrupting the business purpose. See *Utah Chapter of Sierra Club*, 226 P.3d 719. The court explained the appropriate analytical process to be applied when drawing this line, stating:

"[T]he purpose of a proposed facility is determined by the description in the application submitted for the proposed facility, so long as the 'purpose or design is objectively discernable.' [Citation omitted.] . . . We emphasize that the purpose of the project must be objective and must focus on the overall business purpose for the proposed facility. We are wary of the risk of applicants describing a project in such a limited manner that they are able to circumvent the goals of BACT, which include encouraging the use of new technologies. [Citation omitted.] . . . Thus, when considering what design elements are inherent to the project, cost and avoidance of the risks associated with adopting new technologies cannot support what is considered fundamental to a project's design. [Citation omitted.]

. . . Instead, the fundamental aspects must relate to the basic business purpose of the proposed facility.

"Applying our holding to the facts of this case, we conclude that considering IGCC would not require the Power Company to redefine the design of its proposed facility. . . . [T]he basic design of the Power Company's proposed facility is an electric power generating plant fueled by coal. With this purpose, it is evident that the Power Company was not required to consider wind generation for electric power as an alternative process. . . . We note that the consideration of IGCC in the BACT review does not compel its adoption; instead, it only requires the Power Company to subject IGCC to the five-step top down analysis used to determine the best available technology." *Utah Chapter of Sierra Club*, 226 P.3d at 732-33.

Hence, *Desert Rock Energy* and *Utah Chapter of Sierra Club* call into question the KDHE's and Intervenors' broad assertion that use of IGCC technology would require a redesign of the project, as the term "redesign" is used in a BACT analysis.

Nevertheless, although " '[c]onsistency in the approach to decision-making is a primary objective of the top-down BACT approach,' [citation omitted]," *Desert Rock Energy*, 2009 WL 3126170, at *38, the statutory definition of BACT specifically indicates it is defined on a case-by-case basis. 42 U.S.C. § 7479(3) (2006) (BACT is "an emission limitation based on the maximum degree of [pollutant] reduction . . . which the [state] permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for [the] facility"). Therefore, *Desert Rock Energy* and *Utah Chapter of Sierra Club* do not compel us to agree with Sierra Club.

There are two important distinctions between the KDHE's analysis and the analysis at issue in *Desert Rock Energy* and *Utah Chapter of Sierra Club*. First, the KDHE systematically discussed reasons the IGCC design differed from the design proposed by Sunflower using supercritical pulverized coal (SCPC) technology. In this way, the record before us differs from that considered in *Desert Rock Energy*. Second, the Holcomb 2 business purpose is not just limited to creating a coal-fired plant; the application and the KDHE's analysis indicate that another business purpose is the integration of Holcomb 2 with Holcomb 1. Some of the KDHE's reasons for not including IGCC technology in the first step of the

BACT analysis are consistent with this business purpose. In the KDHE's responses to the public comments, it noted:

"Because of the substantially different processes and components of IGCC versus SCPC, the footprint for an IGCC unit would be from two to three and one-half times the size of the footprint of an SCPC unit with similar generating capacity. The design of an integrated SCPC facility provides for maximum utilization of water resources by recycling and reuse, whereas an IGCC facility would necessitate either deep well injection or the development of a waste water discharge permit for some waste water streams. The processes necessary for managing the by-products from an SCPC steam generator are already in place at Holcomb Station. However, with an IGCC facility, there would be additional waste streams, (such as elemental sulfur) which would either need to be sold into commerce or landfilled. IGCC and SCPC are inherently different process technologies; to substitute one for another would redefine the design of the source."

Because the integration of Holcomb 2 into Holcomb 1 is a business purpose that distinguishes our case from other situations, we conclude the KDHE's failure to include IGCC technology in the first step of the BACT analysis under 42 U.S.C. § 7475 (2006) was not unreasonable, arbitrary, or capricious. See K.S.A. 2012 Supp. 77-621(c)(4), (c)(8). We further conclude that the KDHE's findings of fact regarding the possible use of IGCC technology at Holcomb 2 are supported by substantial evidence in the record, evidence we cannot reweigh under our standard of review. K.S.A. 2012 Supp. 77-621(d).

### (2) *Natural Gas Appropriately Considered*

Sierra Club also contends that the KDHE erred in failing to adequately consider the use of natural gas in the first step of the BACT analysis. More specifically, Sierra Club contends that the EPA and the federal Environmental Appeals Board have required the use of "clean fuels" in a BACT analysis. See *In Re Northern Michigan University Ripley Heating Plant*, PSD Appeal No. 08-02, 14 E.A.D. 283, 2009 WL 443976 (EAB 2009) (EPA agency order) (citing 42 U.S.C. § 7479[3]; in making BACT determinations, applicants and public officials are to consider clean fuels). Although Sierra Club broadly refers to clean fuels, the only fuel it discusses is natural gas. Consequently, we will likewise limit our analysis.

In arguing that the KDHE erred when it determined that "fuel choice is integral to a power plaint's basic design" and therefore need not be included in the first step of the BACT analysis, Sierra Club points to an order issued by the EPA in an unrelated case, *In re Cash Creek Generation*, Nos. IV-2008-1, IV-2008-2 (EPA agency order issued December 15, 2009, responding to a merged PSD construction permit and CAA Title V operating permit) where the EPA objected to a state-issued PSD permit for a proposed IGCC power plant that failed to consider natural gas as a primary fuel source, especially because the site had access to a natural gas supply and the applicant planned to use natural gas at startup and as a backup fuel. Commentators have suggested that the *Cash Creek* order suggests " 'a progression in which EPA is requiring gasification to be considered as BACT for pulverized coal plants and natural gas to be considered as BACT for gasification plants.' " Stensvaag, 41 Envtl. L. Rep. News & Analysis, at 11117. As we have discussed, Holcomb 2 is not proposed as a IGCC—*i.e.*, gasification—plant, and Sierra Club has not provided us a record citation that would suggest any plan to use natural gas at startup or as a backup fuel. Consequently, we presume that this case is factually distinguishable from *Cash Creek*. See Supreme Court Rule 6.02(a)(4) (2012 Kan. Ct. R. Annot. 39) ("The court may presume that a factual statement made without a reference to volume and page number has no support in the record on appeal.").

In addition, there is authority that supports the KDHE's position that natural gas did not have to be considered in the first step of the BACT analysis. Although a permitting authority may exercise broad discretion in considering clean fuels or innovative technologies, "changing a fuel source would drastically redesign a proposed facility and therefore production processes that involve a completely different fuel source need not be considered." *Utah Chapter of Sierra Club*, 226 P.3d at 732. See *Powder Riv. Bas. Res.*, 226 P.3d at 822 (" '[A]pplicants proposing to construct a coal-fired electric generator . . . have not been required by EPA as part of a BACT analysis to consider building a natural gas-fired electric turbine although the turbine may be inherently less polluting per unit product.' "); Comment, *EPA's Proposed New Source Performance Standards to Con-*

*trol Greenhouse Gas Emissions from Electric Utility-Generating Units*, 42 Envtl. L. Rep. News & Analysis 10606, 10613 (July 2012) ("require[ing] the use of natural gas for an applicant seeking to build a coal-fired power plant would, in most cases, be a fundamental redefinition of the project"). Likewise, changing a fuel source would change the business purpose of the facility. See *Sierra Club*, 499 F.3d at 657 (upholding Environmental Appeals Board's decision that requiring a proposed mine-mouth plant to consider a different fuel source would redefine the " 'fundamental purpose or basic design of [the] proposed Facility' ").

Based on this persuasive authority and the KDHE's analysis, we conclude the KDHE's decision to not include natural gas at step one of the BACT analysis was not unreasonable, arbitrary, or capricious because changing a fuel source from coal to natural gas would redesign a proposed facility and alter its business purpose and therefore need not be considered. See K.S.A. 2012 Supp. 77-621(c)(4), (c)(8).

### (3) *USPC Technology Appropriately Considered*

In a third technology argument, Sierra Club focuses on whether the BACT would be use of an ultra-supercritical pulverized coal (USPC) boiler. A pulverized coal boiler is the conventional technology for a new coal-burning electric power plant. There are three primary types of pulverized coal boilers. Listed from the least to the most efficient, these are subcritical, supercritical, and ultra-supercritical. See Reitze, *Federal Control of Carbon Capture and Storage*, 41 Envtl. L. Rep. News & Analysis 10796, 10797-98 (September 2011); Reitze, *Electric Power in a Carbon Constrained World*, 34 Wm. & Mary Envtl. L. & Pol'y Rev. 821, 828 (Spring 2010). Holcomb 2 is slated to use the second of these three, a supercritical pulverized coal (SCPC) boiler. Sierra Club argues it is the more efficient ultra-supercritical technology, or USPC, that was the BACT for Holcomb 2.

The EPA, in its comments regarding the KDHE's BACT analysis, faulted the KDHE for failing to include any evaluation of USPC technology. The KDHE responded by stating:

"[T]here are currently no operating ultra-supercritical boilers in the United States. There is one publicized ultra-supercritical facility under construction in the U.S., the John Turk unit in Arkansas, scheduled to begin operations in 2012. This lack of operating history by U.S. Utilities is a key factor in the determination that a supercritical boiler represents BACT for this permit.

"The term 'ultra-supercritical' is associated with a further increase in steam pressures and temperatures to gain higher cycle efficiencies. The higher pressures and temperatures associated with the supercritical steam cycle push the design limitations of materials used in tubing, piping, turbine blades, turbine rotor and turbine shell. There continue to be questions regarding the maturity of the metallurgy and pre-and-post weld fabricating and treatment processes and the adequacy of current repair techniques for these facilities. Each advance in pressure or temperature is limited in some way by material and/or manufacturing limitations, and occasionally by other factors which serve to plateau the efficiencies until those limitations are overcome. When those limitations are overcome, 'ultra-supercritical' is redefined at a new higher standard to achieve in manufacturing capability. There is no bright line that distinguishes between a supercritical and an ultra-supercritical boiler design as there is between subcritical and supercritical.

"Until recently, few new domestic high efficiency supercritical facilities have been constructed. Many of the new facilities characterized as ultra-supercritical are located in East Asia, with little design and operating information about these sources being available. Having this information accessible and verifiable is critical to making a determination that an ultra-supercritical unit is BACT for the proposed Sunflower expansion.

"While KDHE recognizes the benefits associated with the improvements in thermal cycle efficiency, decisions concerning operating temperatures and pressures for the steam cycle must be balanced by other considerations relating to reliability and maintainability of the facility to be constructed."

Sierra Club points to evidence in the record that contradicts these conclusions. For example, in disputing the argument that USPC is unreliable technology, Sierra Club cites the selection of USPC technology for the Arkansas power plant mentioned above and the use of USPC technology outside the United States. Sierra Club further notes that Sunflower's engineering contractor, Black & Veatch, reported favorably about USPC technology in an opinion submitted in separate proceedings involving a Florida power plant. But, as we have previously noted, our role is not to reweigh the evidence. See K.S.A. 2012 Supp. 77-621(d). Although there is conflicting evidence, we conclude there is evidence in the record to support the KDHE's conclusions and these conclusions fit into the

various steps of a top-down BACT analysis. In fact, Sierra Club acknowledges that USPC technology was rejected as BACT for Plant Washington in Georgia—a coal-fired power plant that Sierra Club claims is nearly identical to the proposed Holcomb 2 plant and that Sierra Club offers as an example in the BACT-related argument we will next consider. Thus, there are substantiated reasons for rejecting USPC technology as the BACT.

We conclude the KDHE's decision to not define the BACT as USPC technology was not unreasonable, arbitrary, or capricious because the technology lacks operating history in the United States, information regarding the technology's use and performance in other countries is not accessible or verifiable, and there are concerns about the reliability and maintainability of a facility using the technology. See K.S.A. 2012 Supp. 77-621(c)(8).

### (4) *Permit's BACT Emission Limits for* $NO_x$ *and PM Appropriate*

In the alternative, Sierra Club argues that the Holcomb 2 PSD permit contains erroneous BACT determinations because the emission limits listed in the permit are higher than the emission limits identified in a permit for Georgia's Plant Washington. Sierra Club focuses on the emission limits for nitrogen oxides ($NO_x$) and particulate matter (PM) and asserts that "[r]ather than conduct a proper BACT analysis and impose the lowest possible emissions limits, KDHE allowed Sunflower to include unjustifiably weak emissions limits in its permit to save costs." Sierra Club argues we are obligated to conduct a searching review to determine if the KDHE's conclusions are arbitrary and, therefore, we should not give unquestioned deference to the KDHE's assessments because the KDHE refused to "fully consider and impose" more stringent limits or to "fully and rationally explain its refusal to do so."

While there is legal support for Sierra Club's argument that an applicant should consider technology used in similar facilities, our review of the record as a whole leads us to conclude that the KDHE did not act unreasonably, arbitrarily, or capriciously and did not err in its interpretation or application of the law.

We first note that Sierra Club's statement that the KDHE erred because it failed to "impose the lowest *possible* emissions limits"

(emphasis added) misstates the KDHE's duty. As we have indicated, because the Holcomb 2 site is located in an "attainment" area, Sunflower did not have to establish the "lowest achievable limit," but the best available control technology—BACT, "unless the applicant can show that it is not technically feasible, or if energy, environmental, or economic impacts justify a conclusion that it is not achievable." *Alaska, Dept. Environ. Conserv. v. United States E.P.A.*, 298 F.3d 814, 822 (9th Cir. 2002), *aff'd* 540 U.S. 461, 124 S. Ct. 983, 157 L. Ed. 2d 967 (2004). The more stringent standards apply in nonattainment areas; "where air quality standards have not been met, new and modified sources are required to obtain preconstruction permits, to offset emissions increases with emissions reductions from other sources in the area, and to install 'lowest achievable emissions rate' technology ('LAER')." *New York v. E.P.A.*, 443 F.3d 880, 883 n.1 (D.C. Cir. 2006) (citing 42 U.S.C. § 7503).

The considerations for determining the two standards—LAER and BACT—vary. Nevertheless, in conducting a BACT evaluation, "the proposed source is required to look to other recently permitted sources." *In re Inter-Power of New York, Inc.*, PSD Appeal Nos. 92-8 and 92-9, 5 E.A.D. 130, 135, 1994 WL 114949 (EAB 1994) (EPA agency order); see *In re Indeck-Elwood*, PSD Appeal No. 03-04, 13 E.A.D. 126, 183, 2006 WL 3361087 (EAB 2006) (EPA agency order) ("[T]he existence of a similar facility with a lower emissions limit creates an obligation for [the permit applicant and the permitting agency] to consider and document whether that same emission level can be achieved at [the] proposed facility."). After such a comparison, the BACT is not necessarily the LAER. As stated by the Missouri Court of Appeals:

"There is a distinction between what is 'technically' or theoretically achievable, and what is 'achievable' after considering costs, duration of operations, operational variability, and other case-by-case factors. [The state agency] crafted the permit limit in a way that the facility can meet it over the life of the operation, and therefore built into the limit a 'safety factor' to allow for operational variability. Indeed, the [Environmental Appeals Board] permitting cases, although not binding or controlling upon the [state agency], recognize that permitting agencies should include a safety factor when setting permit limits. Permitting agencies have the discretion to set BACT limits at levels that do not necessarily reflect the

highest possible control efficiencies but, rather, will allow permitees to achieve compliance on a consistent basis. See *In re Knauf Fiber Glass*, 9 E.A.D. 1, 15, 2000 WL 291422 (E.P.A. EAB) ('There is nothing inherently wrong with setting an emission limitation that takes into account a reasonable safety factor'); *In re Masonite Corp.*, 5 E.A.D. 551, 560-61 1994 WL 615380 (E.P.A.). Thus, actual lower emissions at other facilities do not dictate a limit to be set in a permit after accounting for long-term compliance and safety factors." *Chipperfield v. Mo. Air Conservation Com'n*, 229 S.W.3d 226, 248 (Mo. App. 2007).

Against this legal backdrop, we consider the factual basis for Sierra Club's argument regarding Plant Washington, which was discussed during the PSD permitting proceedings in this case. Dr. Ranajit Sahu provided expert opinion and comments on behalf of Sierra Club and Earthjustice and opined that the Plant Washington limits were appropriate BACT emission limits for Holcomb 2.

In the KDHE's formal written response to Dr. Sahu's comments, it noted that "Sunflower considered actual emissions from similar projects and permit determinations. Such consideration is appropriate and consistent with long-standing EPA recommendations for performing a BACT analysis." The KDHE specifically noted the limits set in the Plant Washington permit, including 12-month and 30-day rolling averages of certain emissions, and compared those to the proposed Holcomb 2 PSD permit. It also examined the 30-day averages of eight other power plants. But the KDHE observed that "BACT does not require the selection of an emissions rate that has not been rigorously demonstrated to be achievable, particularly when actual data suggests that the rate would not be achievable over the life of the facility." Further, "[m]any of the permit emissions limitations that were considered in the BACT review have yet to be demonstrated, because the plants have not started operations." Plant Washington was one of those power plants not yet operational.

Focusing on the $NO_x$ limits in the Plant Washington permit, the KDHE noted that Plant Washington's $NO_x$ 30-day rolling average is the same as allowed by the Holcomb 2 permit. But the Plant Washington permit also set a 12-month rolling average that would not allow Plant Washington to emit $NO_x$ at these maximum limits during each 30-day period; if the 30-day limits were consistently

reached, Plant Washington would exceed its permitted 12-month rolling average. The KDHE considered Plant Washington's 12-month rolling average and those of other power plants and concluded that "the Plant Washington annual 12-month rolling average $NO_x$ emission limit of 0.030 lb/MMBtu has not been demonstrated to be achievable." The KDHE, considering Dr. Sahu's data, specifically found the data "for the best performing sources show[s] essentially no reported operational emissions at such levels."

These conclusions are supported by evidence in the record, and we find no basis for holding that the KDHE's conclusions regarding the $NO_x$ emission levels were unreasonable, arbitrary, or capricious. See K.S.A. 2012 Supp. 77-621(c)(7), (c)(8).

With regard to emission limits on PM, Sierra Club argues that the KDHE refused to "fully consider and impose" more stringent limits or to "fully and rationally explain its refusal to do so." But a review of the KDHE's formal written response to public comments shows that the KDHE addressed this concern and provided specific reasons for rejecting Sierra Club's contention that more stringent limits on PM were achievable.

The Holcomb 2 PSD permit requires a short-term average of .018 lb/MMBtu for both $PM_{10}$ (course particles) and $PM_{2.5}$ (fine particles). Regarding Plant Washington's filterable PM emission limit of .010 lb/MMBtu on a 24-hour rolling average, the KDHE noted that the plant "is not operating, so there are no data indicating that permit levels are in fact achievable over the life of the plant." In addition, the KDHE noted that the .0123 lb/MMBtu total $PM_{2.5}$ emission limit on a 3-hour average for Plant Washington was based, in part, on particulate size distribution data in the EPA's publication of compiled air pollution emission factors, referred to as the "AP-42." The KDHE took caution from a recent EPA action in which the EPA indicated, as summarized by the KDHE, that "utilizing a simple ration of AP-42 factors or data from a single compliance stack test would not necessarily be sufficient to establish a correlation between $PM_{10}$ and $PM_{2.5}$." Instead, the KDHE chose to rely on "actual test data from a similar unit taking into account variations in operating conditions." These conclusions and

the resulting emission limits were not unreasonable, arbitrary, or capricious.

Finally, Sierra Club points out that the Holcomb 2 PSD permit contains a "contingency limitation of 0.025 lb/MMBtu" if Sunflower fails to meet initial performance tests. Sierra Club argues the contingency limit "cannot be justified" but articulates no reason why this provision invalidates the permit or any authority supporting its argument. A failure to support an argument with pertinent authority or to show why the argument is sound despite a lack of supporting authority or in the face of contrary authority is akin to failing to brief the issue. Therefore, an argument that is not supported with pertinent authority is deemed waived and abandoned. *State v. Berriozabal*, 291 Kan. 568, 594, 243 P.3d 352 (2010); see Supreme Court Rule 6.02(a)(5) (2012 Kan. Ct. R. Annot. 39) (appellant's brief must include "the arguments and authorities relied on").

In summary, even though the $NO_x$ and PM emission limits in the Holcomb 2 PSD permit exceed those of Plant Washington in some respects, the KDHE's decision to set limits that will be achievable over the life of the plant is not unreasonable, arbitrary, or capricious and is supported by evidence that is substantial when viewed in light of the record as a whole. See K.S.A. 2012 Supp. 77-621(c)(7), (c)(8), and (d).

## VIII. KDHE's Procedure Was Adequate

Sierra Club's final issue focuses on the inadequacy of the overall process used for the approval of the Holcomb 2 PSD permit. Sierra Club contends this court should reverse the Secretary's decision to grant the PSD permit because the Secretary and the KDHE (collectively, the KDHE) failed to follow the procedural requirements of the CAA, 42 U.S.C. § 7401 *et seq.*; the KAQA, K.S.A. 65-3001 *et seq.*; and the applicable federal and state regulations. Many of the arguments relating to the conduct of public hearings and the consideration of public comments are likely to be moot because K.S.A. 2012 Supp. 65-3008a provides that "[n]o permit shall be . . . modified without first providing the public an opportunity to comment and request a public hearing on the proposed permit action."

Other issues may be rendered moot if it is determined on remand that the settlement agreement and K.S.A. 2012 Supp. 65-3029 do not apply. Nevertheless, because we do not express an opinion regarding the scope of proceedings on remand or as to the impact of the settlement agreement on those proceedings, we cannot determine if the issues are moot or if they are likely to occur on remand. Consequently, we will discuss the arguments raised by Sierra Club.

In addressing the standard of review for this issue, Sierra Club indicates it relies on subsections (c)(4) through (c)(8) of K.S.A. 2012 Supp. 77-621. We will separately consider how Sierra Club's arguments relate to these provisions.

A. *K.S.A. 2012 Supp. 77-621(c)(4) and (c)(5)—Lawful Procedure*

Both K.S.A. 2012 Supp. 77-621(c)(4) and (c)(5) relate to whether the KDHE followed a lawful procedure. Subsection (c)(4) focuses on whether the KDHE "erroneously interpreted or applied the law" and subsection (c)(5) focuses on whether the KDHE "engaged in an unlawful procedure or has failed to follow prescribed procedures." The gist of Sierra Club's arguments is that the KDHE's duties in the permit process were thwarted by the actions of then-Governor Parkinson in signing the settlement agreement and of the Kansas Legislature in passing the 2009 legislation that Sierra Club asserts encroached on the KDHE's duties in reviewing Sunflower's PSD permit application. By arguing that the KDHE followed an illegal procedure, Sierra Club asserts the KDHE erroneously applied the CAA.

In making this argument, Sierra Club reiterates the KDHE's duties. It emphasizes that Kansas' SIP provides the KDHE with the exclusive authority to issue PSD permits and requires the KDHE to provide the public an opportunity to participate in the permitting process. See 42 U.S.C. § 7475(a)(2) (2006) (public must have opportunity to comment on "air quality impact of [the new facility], alternatives thereto, control technology requirements, and other appropriate considerations" in order to assist the issuing authority's decision of whether to issue a permit); 40 C.F.R. § 52.21(a)(2)(iii) (2012) ("The Administrator has authority to issue

any such permit."); K.A.R. 28-19-350(c) (2012 Supp.) ("When used in any provision adopted from 40 C.F.R. 52.21, each reference to 'administrator' shall mean the 'secretary of health and environment or an authorized representative of the secretary,' " with certain exceptions.); K.A.R. 19-28-204(a) (public "shall be provided the opportunity to participate in the permit development" prior to issuance of a construction permit for a new facility).

Sierra Club argues the KDHE was prevented from exercising these duties by language in the settlement agreement indicating that the KDHE "shall" issue a final permit to Sunflower "substantially in the form of" the prior 2007 draft permit and by a legislative amendment to the KAQA providing that "[t]he secretary shall timely approve a prevention of significant deterioration permit (PSD) to sunflower electric power corporation to be issued consistent with the settlement agreement executed May 4, 2009." K.S.A. 2012 Supp. 65-3029(a). The unlawful effect of these provisions, according to Sierra Club, is that the settlement agreement and subsequent legislation: (1) unilaterally modified Kansas' SIP; (2) preempted the KDHE's duty to fully examine the issues and determine whether the PSD permit should be granted by dictating the content and the issuance of the permit; (3) constrained the KDHE from considering fuel alternatives other than coal; and (4) thwarted meaningful participation of the public.

*(1) Unilateral Amendment of Kansas' SIP*

Although Sierra Club has argued about the legality of the settlement agreement and the legislation, it has filed this action under the KJRA. Under the KJRA, a court does not have jurisdiction to review actions of the Kansas Legislature even if, as Sierra Club maintains, the action is an unlawful, unilateral amendment of the SIP. The KJRA only allows review of agency actions by a state agency and " '[s]tate agency' " does not include the "legislative branch of state government." K.S.A.77-602(k); see K.S.A. 77-602(b) (defining "[a]gency action" under the KJRA).

While there are mechanisms for judicial review of legislation, Sierra Club has not brought such an action. In addition, as aptly pointed out by the KDHE in its appellate brief, this lawsuit was

not brought to enforce Kansas' SIP. See 42 U.S.C. § 7604 (2006) (citizen suit provisions); *Her Majesty the Queen v. City of Detroit,* 874 F.2d 332, 335 (6th Cir. 1989) (EPA-approved state implementation plans are enforceable in federal court).

Instead, the only agency action before us is the issuance of the Holcomb 2 PSD permit. Therefore, the only issue before us is whether the KDHE's action in issuing the permit is lawful.

### (2) *Full Examination of Application*

In focusing on the permit, the Intervenors and the KDHE argue that the Secretary fulfilled all of his duties and exercised his discretion to issue the permit. As they point out, the plain language of the settlement agreement did not render the issuance of a PSD permit "a foregone conclusion." Nor did either the governor or the legislature make the decision to issue the permit. Instead, the agreement directed the Secretary to apply applicable federal and state requirements. It qualified the directive to issue a permit by recognizing that the project had to comply with emission limits, stating: "Subject to the modifications as may be required herein and the confirmation of BACT emission limitations and PSD increment consumption constraints, the Secretary shall issue the final permit substantially in the form of the draft final permit prepared by the KDHE technical staff on or about July 17, 2007." The agreement also specifically refused to "diminish or supplant the authority of the Secretary or KDHE under the statutes and lawful regulations which they administer." And it provided that "Sunflower's performance hereunder is subject to and conditioned upon receiving all governmental and regulatory approvals necessary for it to lawfully perform the terms and conditions hereof."

Likewise, while K.S.A. 2012 Supp. 65-3029(a), a provision adopted in the 2009 legislation, directed the KDHE to "timely approve" a PSD permit for Sunflower, it qualified the directive by adding that the permit was to be issued consistent with the settlement agreement. Because the settlement agreement expressly preserved the KDHE's discretion and its obligation to follow applicable state and federal requirements, the legislation did not abrogate the decision-making responsibilities of the KDHE.

Moreover, the record establishes that the KDHE recognized its discretion. In formal written responses to public comments submitted by Sierra Club, the KDHE stated: "KDHE is bound by both State and Federal law to carry out the permitting responsibilities for sources of air pollution within the State."

Sierra Club counters this by noting that the agreement accepted Sunflower's estimate of actual HAPs emissions instead of leaving the KDHE to conduct its own analysis. As we have discussed, we are vacating the permit and ordering that the KDHE must apply new HAPs regulations before issuing a new permit. These new regulations render moot any question about the KDHE's acceptance of Sunflower's HAPs estimates and, therefore, we will not further discuss this aspect of Sierra Club's argument. See *Dickey Oil Co. v. Wakefield*, 153 Kan. 489, Syl. ¶ 1, 111 P.2d 1113 (1941) (court ordinarily will not consider and decide mooted issues).

### (3) *Fuel Alternatives Considered*

Sierra Club argues that other portions of the record also support its contention that the settlement agreement usurped the KDHE's authority; specifically, Sierra Club argues the KDHE felt it could not consider "alternatives" to coal as the power plant's fuel. During the permit process, the CAA requires a public hearing to be held "with opportunity for interested persons . . . to appear and submit written or oral presentations on the air quality impact of such source, *alternatives thereto*, control technology requirements, and other appropriate considerations." (Emphasis added.) 42 U.S.C. § 7475(a)(2). According to Sierra Club, although its organization and others made public comments urging the KDHE to consider alternatives to coal, the KDHE declined "on the grounds that it lacked authority to do so under the terms of the Settlement Agreement and associated legislation." For support, Sierra Club cites to a specific page in the KDHE's formal written response, which states: "The comments [regarding energy efficiency, utilization of cleaner energy and renewable energy, and energy conservation] address Sunflower's basic technology selection. KDHE lacks statutory or regulatory authority to redefine the source that Sunflower

seeks to permit." The KDHE then discussed the reasons Sunflower had rejected use of "a simple or combined cycle natural gas unit."

This formal response does not support Sierra Club's contention that the KDHE felt it "lacked authority" to consider alternatives to coal under the terms of the settlement agreement and corresponding legislation. Nothing in the above-quoted passage mentions the settlement agreement, the 2009 legislation, or any constraints imposed in the agreement or the legislation. Rather, the context of the statement is the application of the BACT review requirements in the context of natural gas. As we have discussed, " '[h]istorically, EPA has not considered the BACT requirement as a means to redefine the design of the source when considering available control alternatives.' " *Longleaf Energy v. Friends of the Chattahoochee*, 298 Ga. App. 753, 760-61, 681 S.E.2d 203 (2009) (quoting EPA, New Source Review Workshop Manual: Prevention of Significant Deterioration and Nonattainment Area Permitting, p. B.13 [1990]). Hence, in the context in which it was made, the KDHE's statement was not a misstatement of the law.

In other words, Sierra Club's argument simply lacks factual support and fails on that basis.

### (4) *Meaningful Public Input*

Sierra Club also argues that the public hearings and public comment periods were not "meaningful" because the settlement agreement and subsequent legislation essentially "took the decision whether to issue a permit away from KDHE . . . thereby undermining the very purpose of public comment." See *In re Prairie State Generation Station*, PSD Appeal No. 05-02, 12 E.A.D. 176, 180, 2005 WL 735942 (EAB 2005) (EPA agency order) (stating the Secretary is required to " 'consider comments with a truly open mind, rather than with a view to defending a decision he or she already has made' "). We will separately address the "meaningfulness" of the comment procedure in our review under K.S.A. 2012 Supp. 77-621(c)(6). Here, we focus on the mechanics of the procedure and conclude that the KDHE followed them.

As the KDHE pointed out in its formal written response to Sierra Club's comment regarding the lack of public participation,

"[t]he KDHE followed the public participation requirements of K.A.R. 28-19-350 and K.A.R. 28-19-204." Further, in answering Sierra Club's public comment suggesting that the length of the comment period should have been extended, the KDHE stated:

"KDHE has complied with all federal and state requirements for public review and comment of this project. Due to the large amount of interest, a 45-day public notice period and 3 public hearings were held across the state in August [2010]. An additional 30-day notice was provided due to the discovery of a modeling inconsistency and a fourth public hearing was held to ensure the public could comment on all aspects of the proposed permit."

In summary, we conclude the KDHE did not erroneously interpret the law or engage in an unlawful procedure or fail to follow the prescribed procedures. Consequently, we do not find a basis for invalidating the Holcomb 2 PSD permit under K.S.A. 2012 Supp. 77-621(c)(4) or (c)(5).

B. *K.S.A. 2012 Supp. 77-621(c)(6)—The Decision Maker Was Properly Constituted*

Sierra Club also argues the permit is invalid under K.S.A. 2012 Supp. 77-621(c)(6), which provides an agency action is invalid if "the persons taking the agency action were improperly constituted as a decision-making body or subject to disqualification." Sierra Club argues: (1) The settlement agreement and legislation allowed the governor and the legislature to assume authority that legally lies with the Secretary of the KDHE; (2) the Intervenors usurped authority by proposing responses to comments made by members of the public; and (3) due process was denied.

(1) *KDHE Secretary Was the Decision Maker*

To support its position, Sierra Club cites cases standing for the proposition that when a particular governing authority is designated by law as the decision-making authority, another party cannot sidestep that decision maker. See *Accardi v. Shaughnessy*, 347 U.S. 260, 266-68, 74 S. Ct. 499, 98 L. Ed. 681 (1954) (where regulations delegated a particular discretionary decision to the Board of Immigration Appeals, the United States Attorney General could not dictate the Board's decision, even though the Board was appointed by the Attorney General, its members served at his plea-

sure, and its decision was subject to his review); *Portland Audubon Soc. v. Endangered Species*, 984 F.2d 1534, 1545 (9th Cir. 1993) ("[T]he Endangered Species Act explicitly vests discretion to make exemption decisions in the [Endangered Species] Committee and does not contemplate that the President or the White House will become involved in Committee deliberations. The President and his aides are not a part of the Committee decision-making process.").

As we have discussed, however, in the settlement agreement Sunflower acknowledged the agreement did not "diminish or supplant the authority of the Secretary or KDHE under the statutes and lawful regulations which they administer." Furthermore, it was acknowledged that the project would have to meet BACT emission limits and PSD increment consumption constraints before a permit could be approved. Hence, neither the settlement agreement nor the legislation that incorporated the terms of the agreement dictated the Secretary of the KDHE's decision. Nor did the provisions in those documents supplant the Secretary as the ultimate decision maker regarding the PSD permit.

### (2) *Intervenors Did Not Usurp Authority*

Further, Sierra Club suggests that instead of thoroughly reviewing and preparing responses to public comments the KDHE simply used responses prepared by the Intervenors, repeating them verbatim or nearly verbatim. They argue this allowed the Intervenors to usurp the Secretary's authority and rendered the public's comments meaningless. This argument is closely related to Sierra Club's suggestion that the KDHE possessed a bias toward issuing a permit and its failure to properly consider the public comments illustrates this bias.

Indeed, it would have been improper for the KDHE to have prejudged the outcome of the permitting process. See *Tri-County Concerned Citizens, Inc. v. Board of Harper County Comm'rs*, 32 Kan. App. 2d 1168, Syl. ¶ 6, 95 P.3d 1012 (permitting authority must "maintain[] an open mind and continue[] to listen to all the evidence presented before making the final decision"), *rev. denied* 278 Kan. 852 (2004). And regulations require that the response to

public comments be prepared by "the Director", in this case the Secretary of KDHE, or his or her representative. 40 C.F.R. § 124.17(a) (2012); see *In the Matter of Atochem N. American, Inc.,* RCRA Appeal No. 90-23, 3 E.A.D. 498, 499, 1991 WL 158260 (EAB 1991) (EPA agency order) (remanding permit for failure to comply with requirement that "the Director" or his legal designee personally respond to comments).

In this case the KDHE did respond, albeit with heavy reliance on Sunflower's comments. This reliance does not automatically invalidate the process. Although we have said the reliance on a party's proposed findings is "not a practice to be encouraged," we held that "[t]here is nothing inherently wrong with a trial court's adopting a party's findings and conclusions in their entirety as long as they had been individually considered." *Stone v. City of Kiowa,* 263 Kan. 502, 506, 950 P.2d 1305 (1997); see *Anderson v. Bessemer City,* 470 U.S. 564, 572, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985) ("even when the trial judge adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous").

Our thorough review of the record convinces us that the KDHE ultimately performed its role as the "decision-making body." K.S.A. 2012 Supp. 77-621(c)(6). The record reflects the KDHE recognized its duties and discretion and considered the public's comments. The PSD permit was issued only after the KDHE determined, based on the updated information submitted by Sunflower, that the Holcomb 2 proposal would meet all applicable standards, at least as those standards were interpreted by the KDHE.

### (3) *This Was Not a Quasi-Judicial Process*

Sierra Club also cites cases dealing with quasi-judicial proceedings and the due process implications of that process. See, *e.g., McPherson Landfill, Inc. v. Board of Shawnee County Comm'rs,* 274 Kan. 303, Syl. ¶ 2, 49 P.3d 522 (2002) (quasi-judicial agency proceedings "must be fair, open, and impartial" and a "denial of due process renders the resulting decision void"); *Suburban Medical Center v. Olathe Community Hosp.,* 226 Kan. 320, Syl. ¶¶ 4, 5, 597 P.2d 654 (1979) (discussing due process rights when ad-

ministrative agency exercises quasi-judicial powers, including right to have fair, open, and impartial hearing; to receive adequate notice of defined issues; and to be apprised of evidence so it may be tested, explained, or rebutted). But this court has indicated that permit processes like those in this case are not adjudicative proceedings, *i.e.*, not quasi-judicial in nature. See *Board of Sumner County Comm'rs v. Bremby*, 286 Kan. 745, 760-61, 189 P.3d 494 (2008). Further, no violations of any constitutional due process rights have been alleged in this case. The PSD permit is not rendered invalid under K.S.A. 2012 Supp. 77-621(c)(6).

## C. *K.S.A. 2012 Supp. 77-621(c)(7) and (c)(8)*

K.S.A. 2012 Supp. 77-621(c)(7) (sufficiency of evidence) and (c)(8) (unreasonable, arbitrary, or capricious actions) were also cited by Sierra Club as grounds for relief. Although Sierra Club cited these provisions, it did not develop arguments based on those grounds. Consequently, although these review provisions are the focus of our analysis of other issues, we will not further discuss the provision with regard to the effect of the settlement agreement and the 2009 legislation on the permitting process. See *National Bank of Andover v. Kansas Bankers Surety Co.*, 290 Kan. 247, 281, 225 P.3d 707 (2010) (point raised only incidentally in appellate brief but not argued there is deemed abandoned).

In summary with regard to Sierra Club's complaints about the KDHE's procedure, we conclude Sierra Club has failed to meet its burden of establishing that the PSD permit was invalid under K.S.A. 2012 Supp. 77-621(c)(4), (c)(5), or (c)(6). The KDHE was not foreclosed from following the procedural requirements of the CAA by K.S.A. 2012 Supp. 65-3029(a) or the settlement agreement, and the record indicates it fully exercised its discretion and responsibilities. However, as previously discussed, the KDHE committed an error of law in doing so by failing to apply the 1-hour $NO_2$ and $SO_2$ emission limits.

## IX. ADDITIONAL ISSUES RAISED IN *AMICUS CURIAE* BRIEF

Additional issues have been presented to us by Great Plains Alliance for Clean Energy in an *amicus curiae* brief. Kansas appellate procedure does not allow a nonparty, including an *amicus curiae*,

to raise an issue for appellate review, however. See *State ex rel. Six v. Kansas Lottery*, 286 Kan. 557, 561, 186 P.3d 183 (2008). Consequently, we will not address these issues. See *O'Brien v. Leegin Creative Leather Products, Inc.*, 294 Kan. 318, 352, 277 P.3d 1062 (2012) (citing *Kansas Lottery* and declining to address issues raised by *amicus* that had not been raised by the parties).

Reversed and remanded.